## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT J. SOLOMON, Derivatively on Behalf
of Mallinckrodt Pharmaceuticals, Inc. Employee
Stock Purchase Plans,
1853 Sterling Oaks Drive
St. Peters, Missouri 63376

                       Plaintiff,

      vs.

MALLINCKRODT PUBLIC LIMITED
COMPANY
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom


MARK C. TRUDEAU
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

MATTHEW K. HARBAUGH
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

KATHLEEN A. SCHAEFER
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

MELVIN D. BOOTH
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

**Civil Action:**


**COMPLAINT**

**JURY DEMANDED**

DAVID R. CARLUCCI
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

J. MARTIN CARROLL
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

DIANE H. GULYAS
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

NANCY S. LURKER
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

JOANN A. REED
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

ANGUS C. RUSSELL
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

VIRGIL D. THOMPSON
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

#2914619v.1

KNEELAND C. YOUNGBLOOD
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

and

JOSEPH A. ZACCAGNINO,
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

                                        Defendants.

Plaintiff alleges the following based upon the investigation by Plaintiff's counsel, which includes, among other things: a review of Defendants' public documents, media interviews and reports, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mallinckrodt Public Limited Company (also known as Mallinckrodt PLC and/or Mallinckrodt Pharmaceuticals) ("Mallinckrodt" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     Plaintiff, derivatively on behalf of the Company's Employee Stock Purchase Plans ("ESPPs"), brings this action in a derivative capacity against Defendants on behalf of all persons who purchased or otherwise acquired Mallinckrodt stock between November 25, 2014 and January 18, 2017 ("Relevant Period") in the ESPPs.  Plaintiff seeks to recover compensable damages and pursue remedies against Defendants.

2.      Mallinckrodt is a public limited company organized in Ireland with its U.S. headquarters in St. Louis, Missouri.  Mallinckrodt trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MNK."  Mallinckrodt develops and produces specialty pharmaceutical products, including generic drugs and imaging agents, and has in excess of $3.3 billion in annual revenue.

3.      On August 14, 2014, Mallinckrodt acquired Questcor Pharmaceuticals, Inc. ("Questcor") in a $5.6 billion transaction.  As a result of the acquisition, Mallinckrodt added HP Acthar Gel ("Acthar"), an injectable medication made from pigs' pituitary glands, to its drug portfolio.

4.      Acthar is approved by the U.S. Food and Drug Administration ("FDA") as a treatment for 19 different conditions, including infantile spasms, and difficult to treat autoimmune and inflammatory conditions, and is the only approved therapeutic preparation of adrenocorticotropic hormone ("ACTH") in the U.S.

5.      In June 2013, Questcor acquired the U.S. rights to market a synthetic ACTH drug, Synacthen Depot ("Synacthen") from Novartis International AG.  Although not stated at the time, Questcor's acquisition of Synacthen was for the purpose of preventing its competitors from obtaining FDA approval for an alternative ACTH treatment, thereby maintaining its U.S. monopoly on ACTH treatments.

6.      Given the monopoly status of Acthar in the U.S. market, Questcor, and later Mallinckrodt, repeatedly increased the price of Acthar 85,000% from $40 per vial in 2001, to over $34,000 per vial in 2017.

7.      Acthar is now one of the most expensive drugs on the market, and is currently the single most expensive drug reimbursed by both Medicare and Medicaid.  As a result of its

4

acquisition of Questcor, Mallinckrodt obtained the exclusive rights to both Acthar and Synacthen, and Acthar became an important revenue source for Mallinckrodt, representing 34% of the Company's overall sales in 2016.

8.      Throughout the Relevant Period, Defendants made false and misleading statements and failed to disclose material adverse facts about the long-term sustainability of the Company's monopolistic Acthar revenues and the exposure of Acthar to reimbursement rates by Medicare and Medicaid.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that Acthar's monopoly status as the only FDA-approved ACTH preparation was the product of unlawful anticompetitive practices and failed to disclose that its increasing reliance on Medicare and Medicaid meant that the Company's monopolistic Acthar revenue would be threatened if the government took action to limit the price paid for this drug by taxpayers.

9.      On November 25, 2014, Mallinckrodt filed its 2014 Form 10-K with the SEC, and after it completed the acquisition of Questcor on August 14, 2014.  The Company stated in its 2014 Form 10-K that Acthar "has limited direct competition due to the unique nature of the product."  However, the Company failed to disclose that its Acthar revenues were in fact the product of its monopolistic efforts to prevent an alternative ACTH treatment from being introduced in the U.S. market; a practice that it would later be forced to abandon.

10.     The Company's 2014 Form 10-K also failed to disclose the fact that the Company's increasing reliance on Medicare and Medicaid for over 60% of Acthar's sales meant that the Company was highly exposed to changes in reimbursement levels for these programs. As such, this statement created a materially false and misleading impression of the true nature of,

5

and specific risks to Mallinckrodt due to its exposure to Medicare and Medicaid reimbursement levels.

11.     Beginning in the summer of 2015, the high costs (and very substantial cost increases) for certain drugs became a national issue.  As a result, the portion of total Acthar revenues being paid by the federal government was of significant concern to Mallinckrodt investors.

12.     On an October 6, 2015 conference call with investors, Defendant Mark C. Trudeau ("Trudeau") (President, Chief Executive Officer ("CEO") and Director of the Company) was asked about the Company's reliance on Medicare for revenues for Acthar.  Trudeau indicated that Mallinckrodt's combined revenues for Medicare and Medicaid constituted roughly 25% of the Company's total revenues, and that the proportion of Acthar revenues attributable to Medicare and Medicaid was "a little higher than that."

13.     The truth about the Company's dependence on Medicare and Medicaid for Acthar revenue was revealed on November 16, 2016.  On that date, *Citron Research* published a report asserting that the CEO of Mallinckrodt, Defendant Trudeau, lied during an investor conference call on October 5, 2015 when he stated that total Medicare and Medicaid spending on Acthar is "a little bit higher than" 25% of Acthar's sales.  *Citron Research* cited data released by the Centers for Medicare & Medicaid Services on the amount of Medicare and Medicaid spending on Acthar in 2015 and concluded that Medicare and Medicaid spending on Acthar is not "a little bit higher than" 25% of Acthar's sales, but approximately 61% of Acthar's sales.

14.     On this news, shares of Mallinckrodt fell $8.15 per share or approximately 12% to close at $59.65 per share on November 16, 2016.

6

15.     Further information regarding the Company's reliance on Medicare and Medicaid for Acthar revenue was revealed on November 29, 2016.  During a conference call with investors on this date, Defendant Trudeau admitted that "Acthar now represents a significantly greater proportion of our operating income than one-third."

16.     On this news, Mallinckrodt's stock price declined 9.1% from a close of $57.67 per share on November 28, 2016, to close at $52.42 per share on November 29, 2016.

17.     The next day, the Company effectively admitted the falsity of Defendant Trudeau's October 6, 2015 statements, telling investors at a Piper Jaffray Healthcare conference that its reimbursement level from Medicare alone was in the "mid-40s."

18.     The truth about the Company's anticompetitive and unlawful efforts to prevent an alternative ACTH treatment from reaching the U.S. market was revealed on January 18, 2017, when the Federal Trade Commission ("FTC") announced that Mallinckrodt had agreed to pay $100 million in connection with a joint settlement with the FTC and several states.  As part of the settlement, Mallinckrodt also agreed to license Synacthen to a competitor to pursue FDA approval for two of Acthar's primary indications, infantile spasms and nephrotic syndrome.

19.     The news of the settlement, and the fact that Mallinckrodt would lose its ACTH monopoly in the U.S., caused the Company's stock price to decline 5.85% from a close of $49.42 per share on January 17, 2017, to close at $46.53 per share on January 18, 2017.

20.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other members of the ESPPs have suffered significant losses and damages.

## JURISDICTION AND VENUE

21.     Certain claims asserted herein arise under and pursuant to Sections 11 of the Securities Act, 15 U.S.C. § 77k.

22.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

23.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v(a) because the Company conducts a substantial amount of business throughout this District, and a substantial part of the events giving rise to these claims took place in this District. Specifically, the settlement between the FTC and Mallinckrodt was filed in this District. *See* Joint Mot. for Entry of Stipulated Order for Perm. Inj. & Equitable Monetary Relief, *Federal Trade Comm'n, et al. v. Mallinckrodt ARD Inc., et al.*, No. 1:17-cv-00120, ECF No. 2 (D.D.C. Jan. 18, 2017).

24.     The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367.

25.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## **PARTIES**

26.     ***Plaintiff Robert Jay Solomon*** purchased Mallinckrodt securities in the ESPPs at artificially inflated prices during the Relevant Period and has been damaged as a result of the revelation of the Company's false and misleading statements.

27.     ***Defendant Mallinckrodt Public Limited Company*** ("Mallinckrodt") is an Irish public limited company headquartered in Staines-upon Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri.   The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MNK".   Mallinckrodt develops, manufactures,

8

markets and distributes specialty pharmaceutical products and imaging agents, and has in excess of $3.3 billion in annual revenues.

28.     **Defendant Mark C. Trudeau** ("Trudeau") was, at all relevant times, the President and CEO of the Company.  He also serves on the Company's Board of Directors (the "Board"). Defendant Trudeau signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

29.     **Defendant Matthew K. Harbaugh** ("Harbaugh") was, at all relevant times, the Company's Senior Vice President and Chief Financial Officer ("CFO").  Defendant Harbaugh signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

30.     **Defendant Kathleen A. Schaefer** (Schaefer") was, at all relevant times, the Company's Vice President and Corporate Controller.  Defendant Schaefer signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

31.     **Defendant Melvin D. Booth** ("Booth") was, at all relevant times, Chairman of the Board.  Defendant Booth signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

32.     **Defendant David R. Carlucci** ("Carlucci") was, at all relevant times, a Director of the Company.  Defendant Carlucci signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

33.     **Defendant J. Martin Carroll** ("Carroll") was, at all relevant times, a Director of the Company.  Defendant Carroll signed the Company's Mallinckrodt Pharmaceuticals 2016

#2914619v.1

Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

34.     **Defendant Diane H. Gulyas** ("Gulyas") was, at all relevant times, a Director of the Company.  Defendant Gulyas signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

35.     **Defendant Nancy S. Lurker** ("Lurker") was, at all relevant times, a Director of the Company.  Defendant Lurker signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

36.     **Defendant JoAnn A. Reed** ("Reed") was, at all relevant times, a Director of the Company.    Defendant Reed signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

37.     **Defendant Angus C. Russell** ("Russell") was, at all relevant times, a Director of the Company.  Defendant Russell signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

38.     **Defendant Virgil D. Thompson** ("Thompson") was, at all relevant times, a Director of the Company.    Defendant Thompson signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

39.     ***Defendant Kneeland C. Youngblood*** ("Youngblood") was, at all relevant times, a Director.  Defendant Youngblood signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

40.     ***Defendant Joseph A. Zaccagnino*** ("Zaccagnino") was, at all relevant times, a Director.  Defendant Zaccagnino signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016

41.     Defendants Trudeau, Harbaugh, Schaefer, Booth, Carlucci, Carroll, Gulyas, Lurker, Reed, Russell, Thompson, Youngblood, and Zaccagnino are herein referred to as the "Individual Defendants".

## THE ESPP PLANS

**Mallinckrodt Pharmaceuticals, Inc. Employee Stock Purchase Plan Registration Statement, dated November 15, 1999**

42.     On November 15, 1999, the Company filed with the SEC a Registration Statement registering 1,500,000 shares of Company stock at $35.50 for a total of $53,250,000.00 for employees of the Company who wish to purchase Company stock through the Company's Employee Stock Purchase Plan.  The Registration Statement states in relevant part:

> PART II
>
> INFORMATION REQUIRED IN THE REGISTRATION STATEMENT
>
> Item 3.  Incorporation of Documents by Reference.
>
> The following documents filed by the Registrant with the Securities and Exchange Commission are incorporated herein by reference:

(1)     The Annual Report of the Company on Form 10-K for the year ended June 30, 1999.

(2)     The Quarterly Report of the Company on Form 10-Q for the quarter ended September 30, 1999.

(3)     The description of the Corporation's Common Stock contained in the Corporation's Registration Statement on Form 8-A dated April 10, 1987 (as amended on Form 8-A dated November 8, 1991).

**All documents subsequently filed by the Company pursuant to Sections 13(a), 13(c), 14 and 15(d) of the 1934 Act, after the effective date of this Registration Statement and prior to the filing of a post-effective amendment that indicates that all securities offered have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference into this Registration Statement and to be a part hereof from the date of filing of such documents (such documents, and the documents enumerated above, being hereinafter referred to as "Incorporated Documents");** provided, however, that the documents enumerated above or subsequently filed by the registrant pursuant to Section 13(a), 13(c), 14 and 15(d) of the 1934 Act in each year during which the offering made by this Registration Statement is in effect prior to the filing with the Commission of the registrant's Annual Report on Form 10-K covering such year shall not be Incorporated Documents or be incorporated by reference in this Registration Statement or be a part hereof from and after the filing of such Annual Report on Form 10-K.  [Emphasis added].

\*          \*          \*

Item 9.  Undertakings.

The registrant hereby undertakes:

(1)     To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement to include any material information with respect to the plan of distribution not previously disclosed in the Registration Statement or any material change to such information in the Registration Statement.

(2)     That, for the purpose of determining any liability under the Securities Act of 1933, as amended (the "1933 Act"), each

#2914619v.1

such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3)    That, for the purposes of determining any liability under the 1933 Act, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the 1934 Act (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the 1934 Act) that is incorporated by reference in the Registration Statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(4)    To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(5)    Insofar as indemnification for liabilities arising under the 1933 Act may be permitted to directors, officers and controlling persons of the registrant pursuant to the provisions described in Item 6 or otherwise, the registrant has been advised that in the opinion of the Commission such indemnification is against public policy as expressed in the 1933 Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the 1933 Act and will be governed by the final adjudication of such issue.

43.    Upon information and belief, this 1999 ESPP is still effective as there has not been any amendment to this plan nor have the Company shares inside this plan been deregistered.

44.     Further, this ESPP was one part of the employment agreement between Mallinckrodt and its employees and was designed to provide eligible employees of Mallinckrodt with an opportunity to increase their proprietary interest in the success of the Company by purchasing Mallinckrodt stock from the Company and to pay for such purchases through payroll deductions as one benefit of the employment bargain in consideration of the labor of the employees received by Mallinckrodt.

**Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement**

45.     On May 4, 2016, the Company filed with the SEC a Registration Statement registering 5,000,000 shares of Company stock at $61.47 for a total of $ 307,350,000 for employees of the Company who wish to purchase Company stock through the Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan.  The Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan states in relevant part:

> Item 3.
>
> Incorporation of Documents by Reference.
>
> The following documents, which have been filed by the Registrant with the Commission, are incorporated herein by reference (except for any portions of Current Reports on Form 8-K furnished pursuant to Item 2.02 or Item 7.01 thereof and any corresponding exhibits thereto not filed with the Commission):
>
> (a)     The Registrant's Annual Report on Form 10-K for the fiscal year ended September 25, 2015 (Commission File No. 001-35803);
>
> (b)     The Registrant's Quarterly Reports on Form 10-Q for the quarterly periods ended December 25, 2015 and March 25, 2016 (Commission File No. 001-35803);
>
> (c)     The Registrant's Current Reports on Form 8-K filed with the Commission on September 28, 2015, November 27, 2015 and March 22, 2016 (Commission File No. 001-35803).
>
> (d)     The description of the Registrant's Ordinary Shares contained in the Registrant's Registration Statement on

14

Form S-4 filed May 16, 2014 (Commission File No. 333-196054), including any amendment or report filed for the purpose of updating such description.

**All documents filed by the Registrant with the Commission pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act subsequent to the date of this Registration Statement** (other that any such documents or portions thereof that are furnished under Item 2.02 or Item 7.01 of a Current Report on Form 8-K or  otherwise, unless otherwise indicated therein, including any exhibits included with such Items), prior to the filing of a post-effective amendment to this Registration Statement that indicates that all securities offered hereby have been sold or which deregisters all securities then remaining unsold, **shall be deemed to be incorporated by reference in this Registration Statement** and to be a part hereof from the date of filing of such documents.

Any statement contained in this Registration Statement or in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Registration Statement to the extent that a statement contained or incorporated by reference herein or in any subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Registration Statement.  [Emphasis added].

*          *          *

Item 9.

Undertakings.

(a)      The undersigned Registrant hereby undertakes:

(1)   To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement:

(i)      To include any prospectus required by Section 10(a)(3) of the Securities Act;

(ii)     To reflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent

15

post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in this Registration Statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii)    To include any material information with respect to the plan of distribution not previously disclosed in this Registration Statement or any material change to such information in the Registration Statement; provided, however, that the undertakings set forth in paragraphs (a)(1)(i) and (a)(1)(ii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the Registrant pursuant to Section 13 or Section 15(d) of the Exchange Act that are incorporated by reference in this Registration Statement;

(2)    That, for the purpose of determining any liability under the Securities Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof; and

(3)    To remove from registration by means of a post-effective amendment any of the securities being

registered which remain unsold at the termination of the offering.

(b)     The undersigned Registrant hereby undertakes that, for purposes of determining any liability under the Securities Act, each filing of the Registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Exchange Act (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Exchange Act) that is incorporated by reference in this Registration Statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(c)     Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

46.     Upon information and belief, this 2016 ESPP is still effective as there has not been any amendment to this employee stock purchase plan nor have the Company shares inside this employee stock purchase plan been deregistered.

47.     Further, this ESPP was one part of the employment agreement between Mallinckrodt and its employees and was designed to provide eligible employees of Mallinckrodt with an opportunity to increase their proprietary interest in the success of the Company by

17

purchasing Mallinckrodt stock from the Company and to pay for such purchases through payroll deductions as one benefit of the employment bargain in consideration of the labor of the employees received by Mallinckrodt.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE RELEVANT PERIOD

48.     On November 25, 2014, the date Mallinckrodt filed its 2014 Form 10-K with the SEC, the Company stated that Acthar "has limited direct competition due to the unique nature of the product." The 2014 Form 10-K also stated that, with the exception of Acthar's indication for treatment of infantile spasms, "Acthar is not subject to patent or other exclusivity" and that "Acthar's commercial durability therefore relies partially upon product formulation trade secrets, confidentiality agreements and trademark and copyright laws."

49.     The Company's 2014 Form 10-K also failed to disclose the fact that the Company's increasing reliance on Medicare and Medicaid for over 60% of Acthar's sales meant that the Company was highly exposed to changes in reimbursement levels for these programs. As such, this statement created a materially false and misleading impression of the true nature of, and specific risks to Mallinckrodt due to its exposure to Medicare and Medicaid reimbursement levels.

50.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Acthar's "limited direct competition" and "commercial durability" was in fact due to Questcor's illegal anticompetitive conduct in preventing a synthetic version of ACTH to reach the U.S. market, a practice that Mallinckrodt initially followed, but later would later be forced to abandon.

18

51.     The risk disclosures referenced above created a materially false and misleading impression of the true nature of, and specific risks to, Mallinckrodt due its exposure to Medicare and Medicaid reimbursement levels.   As the *Citron Report* revealed on November 16, 2016, Medicare spending in 2014 on Acthar totaled over $391 million, representing over 45% of Acthar sales.   The *Citron Report* further revealed that combined 2014 Medicare and Medicaid spending on Acthar was over $518 million, representing over 60% of Acthar sales.   Therefore, the Company faced extreme exposure to reductions in reimbursement levels by these programs. As a result, the Company's statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

52.     On October 6, 2015, the Company held a conference call with analysts and investors.   During the call, Defendant Trudeau touted growth in Acthar sales, which he described as one of the Company's "key initiatives."   Trudeau stated that one of the "key levers" to Acthar sales growth was "further developing key payer relationships."   This conference call included the following exchange:

> **Jason M. Gerberry**: Hi. Thanks for taking the question.  Sorry if I missed this, but is the tax rate guidance for this year something that you view as a sustainable number in the absence of M&A or how should we be thinking about the tax line?  And then just as a quick follow-up, can you just remind us?  What is your Acthar exposure to Medicare?  Thanks.
>
> **Mark C. Trudeau**: So with regards to your question on Medicare exposure to Acthar, a couple of things.  One, if we look at our overall business, the combined proportion of our business that goes through Medicare and Medicaid combined *it's about a quarter of our business*, roughly.  *Acthar is maybe a little bit higher than that. But in general, our business is about a quarter*.  [Emphasis added].

53.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business

and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that the Company's "business model" and "long term growth strategy" was actually contingent on illegal, anticompetitive conduct in preventing a synthetic version of ACTH to reach the U.S. market, a practice that Mallinckrodt would later be forced to abandon.  Moreover, as the *Citron Report* revealed on November 16, 2016, the percentage of Acthar sales for 2014 attributable to Medicare alone was over 45%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid was over 60%. Furthermore, Defendants failed to disclose that the total percentage of Acthar sales attributable to Medicare increased in 2015, with sales attributable to Medicare alone totaling 48%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid totaling 61%.  As a result, Defendant Trudeau's statements that the combined proportion of the Company's business that goes through Medicare and Medicaid was false and misleading as it was in fact 61%, not 25%.

54.     On November 24, 2015, the Company filed its 2015 Form 10-K, in which it again stated that Acthar "has limited direct competition due to the unique nature of the product" and that "Acthar's commercial durability . . . relies partially upon product formulation trade secrets, confidentiality agreements and trademark and copyright laws."  The 2015 Form 10-K also contained similar risk disclosures as the 2014 Form 10-K.

55.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Acthar's "limited direct competition" and "commercial durability" was in fact due to Questcor's illegal anticompetitive conduct in

preventing a synthetic version of ACTH to reach the U.S. market, a practice that Mallinckrodt continued but would later be forced to abandon.

56.     The risk disclosures referenced above created a materially false and misleading impression of the true nature of, and specific risks to, Mallinckrodt due to its exposure to Medicare and Medicaid reimbursement levels.  As the *Citron Report* revealed on November 16, 2016, the percentage of Acthar sales for 2014 attributable to Medicare alone was over 45%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid was over 60%.  Moreover, the total percentage of Acthar sales attributable to Medicare increased in 2015, with sales attributable to Medicare alone totaling 48%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid totaling 61%.  Therefore, the Company faced extreme exposure to reductions in reimbursement levels by these programs.  As a result, the Company's statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH IS REVEALED

57.     On November 14, 2016, the Centers for Medicare and Medicaid Services ("CMS") released updated drug pricing data for 2015.  The 2015 data revealed that Medicare spending on Acthar had increased from approximately $391 million in 2014, to approximately $503 million in 2014, an increase of over 28%, and that combined Medicare and Medicaid spending on Acthar increased from approximately $518 million in 2014, to approximately $648.5 million in 2015, an increase of over 25%.

58.     On November 16, 2016, *Citron Research* published a report asserting that the CEO of Mallinckrodt, Defendant Trudeau, lied during an investor conference call on October 5, 2015 when he stated that total Medicare and Medicaid spending on Acthar is "a little bit higher

than" 25% of Acthar's sales.  *Citron Research* cited data released by the Centers for Medicare & Medicaid Services on the amount of Medicare and Medicaid spending on Acthar in 2015 and concluded that Medicare and Medicaid spending on Acthar is not "a little bit higher than" 25% of Acthar's sales, but approximately 61% of Acthar's sales.

59.    On this news, shares of Mallinckrodt fell $8.15 per share or approximately 12% to close at $59.65 per share on November 16, 2016, damaging investors.

60.    On November 29, 2016, Mallinckrodt released its fourth quarter 2016 earnings results, and held a conference call with investors.  In his opening remarks, Defendant Trudeau acknowledged that "[a]s we expand patient access [to Acthar] in pulmonology and rheumatology, our patient mix has shifted more toward older patients, many of whom are covered by Medicare."  Trudeau also admitted that "Acthar now represents a significantly greater proportion of our operating income than one-third."

61.    During the call, analysts questioned the Company's dependence on Medicare for Acthar revenue in light of the recently revealed data:

>Analyst [Marc Goodman (UBS)]: For Acthar, just helps [sic] us understand better how much of the [commercial payer] contracting has already kicked in and is impacting the business so far. I'm just trying to understand, you keep increasing commercial contracting, yet the Medicare piece of the business is going up. I heard you comment about the older patients with these indications that seem to be growing.  So I understand that part.  But I just don't understand why that piece of the business is increasing so fast and yet the commercial business is increasing so fast.

62.    Analysts also highlighted Trudeau's earlier misleading statements about the Company's Medicare exposure with Acthar.  For example, Gregg Gilbert of Deutsche Bank noted that "on the amount of Acthar business that's paid for by the government," there has

#2914619v.1

"obviously been some controversy in the market . . . about your potential mischaracterization of the channel mix."

63.     Hugh O'Neill ("O'Neill"), an Executive Vice President and President of Autoimmune & Rare Diseases at the Company, noted that "[a]s it relates to the shift in the payer mix," "there's nothing here that's happening I think that we were surprised by."  Mr. O'Neill's statements confirmed that the Company knew about the increase in Medicare payments for Acthar and that Trudeau's October 6, 2015 statements were false when made.

64.     The news of the Company's increasing exposure to Medicare from Acthar, which it now acknowledged represented "a significantly greater proportion of our operating income than one-third," caused Mallinckrodt's stock price to decline an additional 9.1% from a close of $57.67 per share on November 28, 2016, to close at $52.42 per share on November 29, 2016.

65.     The next day, the Company effectively admitted the falsity of Trudeau's October 6, 2015 statements, telling investors at a Piper Jaffray Healthcare conference that its reimbursement level from Medicare alone was in the "mid-40s."  Specifically, Mr. O'Neill stated: "Our portfolio has shifted a little bit into the mid-40s as it relates to Medicare reimbursement for the product versus where it was a year and a half, two years ago which was more in that low, mid-30s."

66.     On January 18, 2017, the truth about the Company's anticompetitive and unlawful efforts to maintain its monopoly on Acthar by preventing a synthetic ACTH treatment from reaching the U.S. market was revealed, when the FTC announced that Mallinckrodt had agreed to a joint settlement with the FTC and several states.  As part of the settlement, Mallinckrodt agreed to pay $100 million, and more importantly, agreed to license Synacthen to a competitor to

pursue FDA approval for two of Acthar's primary indications, infantile spasms and nephrotic syndrome.

67.     The news of the settlement, and the fact that Mallinckrodt would lose its ACTH monopoly in the U.S., caused the Company's stock price to decline 5.85% from a close of $49.42 per share on January 17, 2017, to close at $46.53 per share on January 18, 2017.

### IN THE ALTERNATIVE, PLAINTIFF'S CLASS ACTION ALLEGATIONS

68.     In the alternative, Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Mallinckrodt securities under the ESPPs between November 25, 2014 and January 18, 2017 inclusive.

69.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Mallinckrodt or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

70.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

71.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

24

72.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether statements made by Defendants during the Relevant Period misrepresented material facts about the business, operations and management of the Company; and

(b)     Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

73.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Against Defendants for Violation of Section 11 of the Securities Act)

74.     Plaintiff realleges each and every allegation set forth above as if each was set forth in full here.

75.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the ESPPs (Plaintiff and Company employees who purchased Company stock in the ESPPs), against Defendants.  The Registration Statements underlying the Offerings were inaccurate and misleading, contained untrue statements of material facts, omitted to state other

facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

76.     As an issuer of the Mallinckrodt stock, Defendants are strictly liable to the ESPPs (Plaintiff and Company employees who purchased Company stock in the ESPPs) for the misstatements and omissions.

77.     Plaintiff acquired Mallinckrodt stock pursuant to the Registration Statements.

78.     Plaintiff and employees who purchased Company stock in the ESPPs have sustained damages as the value of Mallinckrodt stock has declined substantially.  Likewise, the ESPPs themselves have sustained damages as the value of Mallinckrodt stock has declined substantially.

79.     Accordingly, Mallinckrodt is liable to the ESPPS (Plaintiff and Company employees who purchased Company stock in the ESPPs) for damages.

## COUNT II

### (Against Defendants for Breach of Fiduciary Duty)

80.     Plaintiff realleges each and every allegation set forth above as if each was set forth in full here.

81.     A fiduciary who breaches any of his or her responsibilities, obligations or duties shall be personally liable to make good to his wards any losses resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

82.     Defendants had a duty to discharge their duties with respect to the Plaintiff and/or the ESPPs solely in the interests of the participants in the ESPPs and for the exclusive purpose of providing a benefit of the employment bargain to the participants.  Defendants' selection and monitoring of investments under the ESPPs were subject to the above-described fiduciary duties.

26

83.     Defendants had the power to control the ESPPs.  Defendants oversee the ESPPs and are empowered to appoint administrators or to administer the ESPPs.

84.     By virtue of their position, Defendants were in a superior position vis-à-vis Plaintiff and members of the ESPPs to determine the prudence in continued investment in Mallinckrodt stock.  Further, Defendants possessed special knowledge and expertise about the Company such that Plaintiff and members of ESPPs reposed confidence in their offer of Mallinckrodt stock as part of the Company's overall compensation package.

85.     The wages that Plaintiff and members of the ESPPs diverted into the ESPPs were the property of Plaintiff and members of the ESPPs.  By accepting and maintaining the property of Plaintiff and members of the ESPPs, Defendants assumed a fiduciary duty to preserve that property and to keep Plaintiff and members of the ESPPs reasonably informed about all facts relevant to their participation in the ESPPs.

86.     In breach of the fiduciary duty owed to Mallinckrodt employees, Defendants failed to inform Plaintiff and members of the ESPPs of all of the relevant facts surrounding their investment in Mallinckrodt stock through the ESPP.  Further, Defendants breached their fiduciary duty by allowing investment in Mallinckrodt stock through the ESPP to continue, even though they knew or should have known that the investment was imprudent and likely to result in significant losses for Plaintiff and members of the ESPPs.

87.     Defendants' breaches exceeded the scope of their authority as corporate officers and directors.

88.     As a consequence of Defendants' breaches, Plaintiff and the members of the ESPPs suffered losses.

#2914619v.1

89.     Defendants are individually liable to make good to Plaintiff and the members of the ESPPs any losses suffered resulting from each breach.

90.     As a consequence of Defendants' breaches, the ESPPs suffered losses.

91.     Defendants are individually liable to make good to the ESPPs any losses suffered resulting from each breach.

## COUNT III

### (Against Defendants for Misrepresentation and Nondisclosure)

92.     Plaintiff realleges each and every allegation set forth above as if each was set forth in full here.

93.     A fiduciary who breaches any of his or her responsibilities, obligations or duties shall be personally liable to make good to his or her wards any losses to his or her ward, resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

94.     Defendants had a duty to discharge their duties with respect to the ESPPs solely in the interests of the participants.

95.     Defendants breached their fiduciary duties in that they made material misrepresentations and nondisclosures to their wards as alleged above.

96.     Defendants are individually liable to make good to Plaintiff and the participants in the ESPPs, and to the ESPPs themselves, any losses suffered as a result of their breaches.

## COUNT IV

### (Against Defendants for Mismanagement of the Plans' Assets)

97.     Plaintiff realleges each and every allegation set forth above as if each was set forth in full here.

28

98.     A fiduciary who breaches any of his responsibilities, obligations or duties shall be personally liable to make good to the ESPPs any losses suffered by Plaintiff and the participants in the ESPPs resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

99.     Defendants were required to discharge their duties with respect to the ESPPs and the participants in the ESPPs solely in the interests of the ESPPs and the participants therein, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims.

100.    As a consequence of these breaches, Plaintiff and the participants in the ESPPs, and the ESPPs themselves, suffered losses.

101.    Defendants are individually liable to make good to the ESPPs, Plaintiff and the participants in the ESPPs any losses suffered as a result of their breaches.

## COUNT V

### (Against Defendants for Breach of Contract)

102.    Plaintiff realleges each and every allegation set forth above as if each was set forth in full here.

103.    Plaintiff and the other participants in the ESPPs entered into an agreement with Defendants that was part of the employment bargain, which among other things, required Defendants to properly manage and monitor the ESPPs.

104.    Plaintiff and the other participants in the ESPPs performed their obligations under the agreement by devoting their labor to the benefit of Defendant Mallinckrodt and by investing part of their salaries owed by Mallinckrodt into Mallinckrodt stock inside the ESPPs.

29

105.    Defendants are individually liable to make good to the ESPPs, Plaintiff and the participants any losses suffered as a result of their breaches.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  September 6, 2017

**TYDINGS & ROSENBERG**

 /s/  *John B. Isbister*
John B. Isbister (D.C. Bar No. 277418)
jisbister@tydingslaw.com
Jaime W. Luse (D.C. Bar No. 501944)
jluse@tydingslaw.com
Tydings & Rosenberg LLP
One East Pratt Street
Suite 901
Baltimore, MD  21202
(410) 752-9700 – telephone
(410) 727-5460 – facsimile

*Local counsel for Plaintiff*

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY  10016
Telephone: 212-983-1300
Facsimile: 212-983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

#2914619v.1