## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT J. SOLOMON, NATALIE AMAYA, and GREGORY SCHMIDT, Derivatively on Behalf of Mallinckrodt Pharmaceuticals, Inc. Employee Stock Purchase Plans,<br><br>                Plaintiffs,<br><br>   vs.<br><br>MALLINCKRODT PUBLIC LIMITED COMPANY, MARK C. TRUDEAU, MATTHEW K. HARBAUGH, KATHLEEN A. SCHAEFER, MELVIN D. BOOTH, DAVID R. CARLUCCI, J. MARTIN CARROLL, DIANE H. GULYAS, NANCY S. LURKER, JOANN A. REED, ANGUS C. RUSSELL, VIRGIL D. THOMPSON, KNEELAND C. YOUNGBLOOD, and JOSEPH A. ZACCAGNINO,<br><br>                Defendants. | **CIVIL ACTION NO. 1:17-CV-01827-DLF**<br><br>**JUDGE DABNEY L. FRIEDRICH**<br><br>**JURY DEMANDED** |

## AMENDED COMPLAINT

Plaintiffs allege the following based upon the investigation by Plaintiffs' counsel, which includes, among other things: a review of Defendants' public documents, media interviews and reports, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mallinckrodt Public Limited Company (also known as Mallinckrodt PLC and/or Mallinckrodt Pharmaceuticals) ("Mallinckrodt" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available

on the Internet.[1]  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      Plaintiffs, derivatively on behalf of the Company's Employee Stock Purchase Plans ("ESPP" or the "Plan"), bring this action against Defendants on behalf of all persons who purchased or otherwise acquired Mallinckrodt stock in the ESPP between July 14, 2014 and November 6, 2017 (the "Relevant Period").  Plaintiffs seek to recover compensable damages and pursue remedies against Defendants.

2.      Plaintiffs bring this action pursuant to § 11 of the Securities Act of 1933 (the "Securities Act") against Mallinckrodt and the below-defined "Individual Defendants" who were certain Company senior executives and directors that signed the below-defined Registration Statement in connection with the ESPP.  Plaintiffs allege that the Registration Statement contained materially false statements of material facts and/or omitted to state material facts required in order to make those statements therein not misleading.

3.      Pursuant to the Securities Act, Defendants are each strictly liable for the material misstatements and omissions in the Registration Statement and are so liable in their capacities as signers of the Registration Statement.  For their Section 11 claim, Plaintiffs expressly disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

4.      On August 14, 2014, Mallinckrodt acquired Questcor Pharmaceuticals, Inc. ("Questcor") in a $5.6 billion transaction.  As a result of the acquisition, Mallinckrodt added HP Acthar Gel ("Acthar"), an injectable medication made from pigs' pituitary glands, to its drug portfolio.

---

[1]      Plaintiffs' allegations regarding materials below that were not incorporated by reference into the Registration Statement are alleged for purposes of Counts II-V.

5.      Acthar is approved by the U.S. Food and Drug Administration ("FDA") to treat nineteen (19) conditions, including infantile spasms and difficult to treat autoimmune and inflammatory conditions.  It is the only approved therapeutic preparation of adrenocorticotropic hormone ("ACTH") in the U.S.

6.      In June 2013, Questcor acquired the U.S. rights to market a synthetic ACTH drug, Synacthen Depot ("Synacthen") from Novartis International AG.  Although then undisclosed, Questcor's acquisition of Synacthen was for the purpose of preventing its competitors from obtaining FDA approval for an alternative ACTH treatment, thereby maintaining its U.S. monopoly on ACTH treatments.

7.      Given the monopoly status of Acthar in the U.S. market, Questcor, and later Mallinckrodt, repeatedly increased the price of Acthar 85,000% from $40 per vial in 2001, to over $34,000 per vial in 2017.

8.      Acthar is now one of the most expensive drugs and is currently the most expensive drug reimbursed by both Medicare and Medicaid.  As a result of its acquisition of Questcor, Mallinckrodt obtained the exclusive rights to Acthar and Synacthen and Acthar became an important revenue source for Mallinckrodt, representing 34% of its 2016 sales.

9.      Throughout the Relevant Period, Defendants made materially false and misleading statements and failed to disclose material adverse facts about the long-term sustainability of the Company's monopolistic Acthar revenues and the exposure of Acthar to reimbursement rates by Medicare and Medicaid.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that Acthar's monopoly status as the only FDA-approved ACTH preparation was the product of unlawful anticompetitive practices and Defendants failed to disclose that Mallinckrodt's increasing reliance on Medicare and Medicaid

meant that the Company's monopolistic Acthar revenue would be threatened if the government took action to limit the price paid for this drug by taxpayers.

10.     On November 25, 2014, Mallinckrodt filed its 2014 Form 10-K with the SEC and after it completed the acquisition of Questcor on August 14, 2014.  The Company stated in its 2014 Form 10-K that Acthar "has limited direct competition due to the unique nature of the product."  The Form 10-K also disclosed that "[i]n August 2014, we acquired Questcor.  […] Questcor's primary product, [is Acthar. […] The Questcor Acquisition is expected to provide a strong and sustainable platform for future revenue and earnings growth within the Company's Specialty Pharmaceuticals segment."

11.     However, the Company failed to disclose that its Acthar revenues were in fact the product of its monopolistic efforts to prevent an alternative ACTH treatment from being introduced in the U.S. market; a practice that it would later be forced to abandon.

12.     The Company's 2014 Form 10-K also failed to disclose the fact that the Company's increasing reliance on Medicare and Medicaid for over 60% of Acthar's sales meant that the Company was highly exposed to changes in reimbursement levels for these programs. As such, this statement created a materially false and misleading impression of the true nature of, and specific risks to Mallinckrodt due to its exposure to Medicare and Medicaid reimbursement levels.

13.     Beginning in the summer of 2015, the high costs (and very substantial cost increases) for certain drugs became a national issue.  As a result, the portion of total Acthar revenues being paid by the federal government was of significant concern to Mallinckrodt investors.

14.     On an October 6, 2015 conference call with investors, Defendant Mark C. Trudeau ("Trudeau") (President, Chief Executive Officer ("CEO") and Director of the Company) was asked about the Company's reliance on Medicare for revenues for Acthar.   Trudeau indicated that Mallinckrodt's combined revenues for Medicare and Medicaid constituted roughly 25% of the Company's total revenues, and that the proportion of Acthar revenues attributable to Medicare and Medicaid was "a little higher than that."   The Company's November 24, 2015, Form 10-K filing with the SEC similarly disclosed that $1,037.3 million of the Company's net sales of $3,346.9 million were tied to Acthar, and that that was a 744% change from the prior year.

15.     On April 13, 2016, the SEC wrote a letter to the Company's CFO and Defendant Matthew K. Harbaugh ("Harbaugh") stating, in part:

> 2.     Given Acthar's significant contribution to revenues as discussed in prior comment 2, you should revise your risk factors to disclose how certain identified risks have materially impacted your company.   Your risk factors on pages 27-30 only briefly mention Acthar and do not highlight that Acthar accounts for approximately one-third of your net sales and do not explain how these risks have previously impacted stock price and sales of Acthar.   For example, we note that you have not disclosed Aetna's denial of coverage for Acthar and the corresponding impact on revenues and share price, the adverse events related to Acthar (including the increase in adverse events from 2011 to 2013), the particular dependence of Acthar on the availability of reimbursement from insurers given its expense, or the negative publicity surrounding Acthar pricing. Please also clearly state in your risk factor on page 31 that the ongoing investigation by the Department of Justice relates to Acthar.   We recognize that certain of these events occurred prior to your acquisition of Acthar, however these risks continue to appear relevant today.   In future filings starting with your next Form 10-Q, please revise your risk factors to reflect your specific dependence on Acthar and the material risks related to this dependence.
>
> 3.     In addition, where a trend, demand, commitment, event or uncertainty is known, management must make two assessments. Refer to Section III. B of MD&A interpretive release 33-6835.

Given the events discussed in the preceding comment and recent publicity regarding medications with dramatically increased prices, please provide us your analysis of these assessments supporting your conclusion that disclosure of the expected effects on future financial condition and results of operations regarding the uncertainty of maintaining Acthar's current revenue levels is not necessary.

16.     On May 3, 2016, the Company issued a press release as Exhibit 99.1 to a Form 8-K filed with the SEC.  That press release stated, among other things, that "Acthar ® net sales of $248 million, up 8.9%" and raised prior earnings guidance.  The press release noted that "Brands segment revenue was up 60.0% and the primary component of overall net sales acceleration.  Results were led by solid volume growth in H.P. Acthar Gel (repository corticosteroid injection) . . . ."  The release quoted Defendant Trudeau as stating "Mallinckrodt's performance in the second quarter of fiscal 2016 was again very strong, driven by exceptional commercial execution across our Specialty Brands portfolio.  Each of the key branded products contributed volume growth -- Acthar, INOMAX, Therakos and, notably, OFIRMEV -- expanding patient access so more people may benefit from these drugs. The Specialty Brands segment continues to contribute nearly 60% of our total net sales."  Demonstrating just how important Achar was to Mallinckrodt, the press release states in relevant part: "Acthar net sales were $248.4 million in the quarter, an 8.9% increase over $228.0 million.  Mallinckrodt's second largest product, INOMAX, generated net sales of $115.5 million, an increase of 13.8% reported over pro forma net sales of $101.5 million, and up 13.9% on a constant-currency basis."

17.     On August 2, 2016, the Company issued a press release as Exhibit 99.1 to a Form 8-K filed with the SEC.  That press release stated, among other things, that "H.P. Acthar ® Gel net sales up 11.0%" and that "Total Mallinckrodt net sales were $970.6 million in the third quarter of fiscal 2016, up 10.6%, or 10.8% on a constant-currency basis.  Specialty Brands segment revenue was up 32.1% and was the primary component of overall net sales acceleration.

Results were led by solid volume growth in H.P. Acthar Gel[.]"  The press release quoted Defendant Trudeau as stating, in part, "[w]e are particularly pleased with the results in the quarter from Acthar -- driven solely by volume gains . . ." and "[t]otal Mallinckrodt net sales were $970.6 million in the third quarter of fiscal 2016, up 10.6%, or 10.8% on a constant-currency basis.  Specialty Brands segment revenue was up 32.1% and was the primary component of overall net sales acceleration.  Results were led by solid volume growth in H.P. Acthar Gel (repository corticosteroid injection) . . . ."

18.     The truth about the Company's dependence on Medicare and Medicaid for Acthar revenue was revealed on November 16, 2016.  On that date, *Citron Research* published a report asserting that the CEO of Mallinckrodt, Defendant Trudeau, lied during an investor conference call on October 5, 2015 when he stated that total Medicare and Medicaid spending on Acthar is "a little bit higher than" 25% of Acthar's sales.  *Citron Research* cited data released by the Centers for Medicare & Medicaid Services on the amount of Medicare and Medicaid spending on Acthar in 2015 and concluded that Medicare and Medicaid spending on Acthar is not "a little bit higher than" 25% of Acthar's sales, but approximately 61% of Acthar's sales.

19.     On this news, shares of Mallinckrodt fell $8.15 per share or approximately 12% to close at $59.65 per share on November 16, 2016.

20.     Further, information regarding the Company's reliance on Medicare and Medicaid for Acthar revenue was revealed on November 29, 2016.  During a conference call with investors on this date, Defendant Trudeau admitted that "Acthar now represents a significantly greater proportion of our operating income than one-third."

21.     On this news, Mallinckrodt's stock price declined 9.1% from a close of $57.67 per share on November 28, 2016, to close at $52.42 per share on November 29, 2016.

22.     The next day, the Company effectively admitted the falsity of Defendant Trudeau's October 6, 2015 statements, telling investors at a Piper Jaffray Healthcare conference that its reimbursement level from Medicare alone was in the "mid-40s."

23.     The truth about the Company's anticompetitive and unlawful efforts to prevent an alternative ACTH treatment from reaching the U.S. market was revealed on January 18, 2017, when the Federal Trade Commission ("FTC") announced that Mallinckrodt had agreed to pay $100 million in connection with a joint settlement with the FTC and several states.  As part of the settlement, Mallinckrodt also agreed to license Synacthen to a competitor to pursue FDA approval for two of Acthar's primary indications, infantile spasms and nephrotic syndrome.

24.     The news of the settlement, and the fact that Mallinckrodt would lose its ACTH monopoly in the U.S., caused the Company's stock price to decline 5.85% from a close of $49.42 per share on January 17, 2017, to close at $46.53 per share on January 18, 2017.

25.     As a result of the ESPP and/or its participants acquiring Mallinckrodt stock pursuant to a materially false and misleading Registration Statement, Plaintiffs and the other members of the ESPP have suffered significant losses and statutory damages.

## JURISDICTION AND VENUE

26.     Certain claims asserted herein arise under and pursuant to Sections 11 of the Securities Act, 15 U.S.C. § 77k.

27.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

28.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v(a) because the Company conducts a substantial amount of business throughout this District, and a substantial part of the events giving rise to these claims took place in this District.  Specifically, the settlement between the FTC and Mallinckrodt was filed in this

District.   *See* Joint Mot. for Entry of Stipulated Order for Perm. Inj. & Equitable Monetary Relief, *Federal Trade Comm'n, et al. v. Mallinckrodt ARD Inc., et al.*, No. 1:17-cv-00120, ECF No. 2 (D.D.C. Jan. 18, 2017).

29.     The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367.

30.     In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

31.     ***Plaintiff Robert J. Solomon*** purchased Mallinckrodt securities in the ESPP at artificially inflated prices during the Relevant Period and has been damaged as a result of the revelation of the Company's materially false and misleading statements. Among other things, Plaintiff Solomon purchased shares of the Company's common stock pursuant and/or traceable to the materially false and/or misleading Registration Statement and incurred statutory damages.

32.     ***Plaintiff Natalie Amaya*** purchased Mallinckrodt securities in the ESPP at artificially inflated prices during the Relevant Period and has been damaged as a result of the revelation of the Company's materially false and misleading statements. Among other things, Plaintiff Amaya purchased shares of the Company's common stock pursuant and/or traceable to the materially false and/or misleading Registration Statement and incurred statutory damages.

33.     ***Plaintiff Gregory Schmidt*** purchased Mallinckrodt securities in the ESPP at artificially inflated prices during the Relevant Period and has been damaged as a result of the revelation of the Company's materially false and misleading statements. Among other things, Plaintiff Schmidt purchased shares of the Company's common stock pursuant and/or traceable to the materially false and/or misleading Registration Statement and incurred statutory damages.

34.     *Defendant Mallinckrodt public limited company* ("Mallinckrodt") is an Irish public limited company headquartered in Staines-upon Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri.   The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MNK".   Mallinckrodt develops, manufactures, markets and distributes specialty pharmaceutical products and imaging agents, and has in excess of $3.3 billion in annual revenues.

35.     *Defendant Mark C. Trudeau* ("Trudeau") was, at all relevant times, the President and CEO of the Company.   He also serves on the Company's Board of Directors (the "Board"). Defendant Trudeau signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

36.     *Defendant Matthew K. Harbaugh* ("Harbaugh") was, at all relevant times, the Company's Senior Vice President and Chief Financial Officer ("CFO").   Defendant Harbaugh signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

37.     *Defendant Kathleen A. Schaefer* (Schaefer") was, at all relevant times, the Company's Vice President and Corporate Controller.   Defendant Schaefer signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

38.     *Defendant Melvin D. Booth* ("Booth") was, at all relevant times, Chairman of the Board.   Defendant Booth signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

39.     *Defendant David R. Carlucci* ("Carlucci") was, at all relevant times, a Director of the Company.   Defendant Carlucci signed the Company's Mallinckrodt Pharmaceuticals 2016

Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016. Defendant Carulcci served as a member and/or chairman of the Committee during the Relevant Period.

40. **Defendant J. Martin Carroll** ("Carroll") was, at all relevant times, a Director of the Company. Defendant Carroll signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

41. **Defendant Diane H. Gulyas** ("Gulyas") was, at all relevant times, a Director of the Company. Defendant Gulyas signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016. Defendant Gulyas served as a member of the Committee during the Relevant Period.

42. **Defendant Nancy S. Lurker** ("Lurker") was, at all relevant times, a Director of the Company. Defendant Lurker signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016. Defendant Lurker served as a member of the Committee during the Relevant Period.

43. **Defendant JoAnn A. Reed** ("Reed") was, at all relevant times, a Director of the Company. Defendant Reed signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

44. **Defendant Angus C. Russell** ("Russell") was, at all relevant times, a Director of the Company. Defendant Russell signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

45.     **Defendant Virgil D. Thompson** ("Thompson") was, at all relevant times, a Director of the Company.   Defendant Thompson signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016. Defendant Thompson served as a member of the Committee during the Relevant Period.

46.     **Defendant Kneeland C. Youngblood** ("Youngblood") was, at all relevant times, a Director.   Defendant Youngblood signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016.

47.     **Defendant Joseph A. Zaccagnino** ("Zaccagnino") was, at all relevant times, a Director.   Defendant Zaccagnino signed the Company's Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan Registration Statement that was filed with the SEC on May 4, 2016

48.     Defendants Trudeau, Harbaugh, Schaefer, Booth, Carlucci, Carroll, Gulyas, Lurker, Reed, Russell, Thompson, Youngblood, and Zaccagnino are herein referred to as the "Individual Defendants". Defendants Carlucci, Gulyas, Lurker, and Thompson are herein referred to as the "Committee Defendants".

49.     The Individual Defendants each participated in the preparation of and/or signed (or authorized the signing of their names to) the Registration Statement.   Mallinckrodt and the Individual Defendants who signed (or authorized the signing of their names to) the Registration Statement are strictly liable for the materially false and misleading statements set forth in or incorporated by reference into the Registration Statement.   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of

the Registration Statement and the documents that are incorporated by reference into the Registration Statement such as Mallinckrodt's reports to the SEC, press releases, and, for purposes of claims brought under state laws, presentations to securities analysts, money and portfolio managers, and institutional investors; *i.e.*, the information disclosed to the market.

## THE ESPP

50.     Mallinckrodt's November 24, 2015, Form 10-K filed with the SEC states, in relevant part,

> The Company adopted the Mallinckrodt Employee Stock Purchase Plan ("ESPP") effective October 1, 2013. Substantially all full-time employees of the Company's U.S. subsidiaries and employees of certain qualified non-U.S. subsidiaries are eligible to participate in this ESPP. Eligible employees authorize payroll deductions to be made for the purchase of shares. The Company matches a portion of the employee contribution by contributing an additional 15% (25% in fiscal 2014 and fiscal 2015) of the employee's payroll deduction up to a $25,000 per employee contribution.[2]

51.     The 2013 ESPP was Exhibit 10.11 of Amendment No. 3 to the Company's Registration Statement on Form 10 filed on May 31, 2013, File No. 001-35565.  It was subsequently replaced by the Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan, but they are functionally similar in all material respects for purposes of the claims asserted.

52.     The ESPP's stated purpose "is to serve as an incentive for employee recruitment and retention by providing all of our employees with an opportunity to purchase our ordinary shares through accumulated payroll deductions."  This purpose was frustrated by wasting Plan

---

[2]     According to the SEC, "Form S-8 is the short-form Securities Act registration statement for offers and sales of securities to employees. Unlike other Securities Act registration forms, Form S-8 does not contain a separate disclosure document called a 'prospectus.' Instead, Form S-8 relies on documents otherwise provided by the employer to satisfy the disclosure obligations of the Securities Act.  This abbreviated disclosure is available for offers and sales of securities to employees because of the compensatory nature of these offerings and employees' familiarity with the company's business due to the employment relationship.…" https://www.sec.gov/news/extra/micros8.txt.

assets, as discussed below.  Had Defendants complied with Section 11, employees would have received a larger number of shares for their fixed contributions, thereby increasing their percentage ownership in the Company and their chance for long-term growth therein.

53.     Five million shares were initially authorized for purchase under the Plan.  Shares were to be purchased through payroll deductions, with the Company matching a part of the employee contribution.

54.     Eligible employees, as determined by the Company, were permitted to purchase shares at a discount within the confines of the ESPP.

55.     The ESPP purchased shares "on the open market by a broker designated by the Human Resources and Compensation Committee of the Board of Directors [(the "Committee")]."

56.     It appears that the ESPP operates as a trust.  The ESPP states:

> The purchase price of the ordinary shares is accumulated by payroll deductions during the offering period. No eligible employee may purchase ordinary shares under the ESPP if all of the employee's rights granted under all "employee stock purchase plans" of the Company and its affiliates, as defined by Section 423(b)(8) of the Code, exceeds $25,000 per calendar year. Payroll deductions commence on the first payroll following the offering date. Participants do not have the ability to increase their rate of payroll deductions during an offering period.

> All payroll deductions are credited to the participant's account under the ESPP and are deposited with our general funds. All payroll deductions received or held by us may be used for any corporate purpose.

> *     *     *

> By executing a participation agreement to participate in the ESPP, each employee is in effect granted an option to purchase ordinary shares on each Exercise Date during the offering period. The maximum number of ordinary shares placed under option to a participant in an offering period is that number determined by dividing the amount of the participant's total payroll deductions

accumulated prior to such Exercise Date by the applicable purchase price. Unless a participant withdraws from the ESPP, such participant's option for the purchase of ordinary shares will be exercised automatically on the Exercise Date for the maximum number of ordinary shares at the applicable price. All ordinary shares purchased are required to be held by participants for 12 months after purchase.

57.     The ESPP includes that Participants' rights are tied to their employment contract (be it implied or actual). According to the ESPP, "[r]ights granted under the Plan shall not be transferable by a participant otherwise than by will or the laws of descent and distribution, or by a beneficiary designation as provided in paragraph 14 and, otherwise during his or her lifetime, shall be exercisable only by the person to whom such rights are granted." Moreover, the ESPP states that:

> Rights granted pursuant to any Offering under the Plan shall terminate immediately upon cessation of a participant's employment with the Company and any designated Affiliate, for any reason, and the Company shall distribute to such terminated employee all of his or her accumulated payroll deductions (reduced to the extent, if any, such deductions have been used to acquire Stock for the terminated employee), under the Offering, without interest.

58.     Further showing the tie between employment and Plan participation, the Company's January 22, 2016, Proxy Statement states:

> We believe that having an employee stock purchase plan plays a key role in our ability to recruit, reward and retain employees. Companies like ours have historically used stock purchase plans as an important part of recruitment and retention packages. We compete directly with other companies for experienced personnel and believe that we must be able to offer comparable packages to attract the caliber of individuals necessary to our business.

59.     The Company's January 22, 2016, Proxy Statement asked shareholders to approve the 2016 Mallinckrodt Pharmaceuticals Employee Stock Purchase Plan, disclosing that:

> Eligible employees authorize payroll deductions to be made for the purchase of ordinary shares and, for fiscal 2015, we provided a

15% matching contribution for all employees who participated in this program for up to $25,000 of an employee's payroll deductions in any calendar year.  All shares are purchased on the open market by a designated broker and are required to be held by participants for 12 months after purchase.  In September 2015, our Board of Directors adopted our 2016 Employee Stock Purchase Plan, which we refer to as the ESPP, subject to shareholder approval. The ESPP is designed to qualify as an "employee stock purchase plan" under Section 423 of the Internal Revenue Code. Shareholder approval of the ESPP is required in order to comply with the requirements of Section 423 so that certain tax benefits will be available to our employees.  If the ESPP is approved by our shareholders, the Prior Plan will be terminated effective upon implementation of the ESPP and no additional shares will be offered for purchase under the Prior Plan after that date.  If the ESPP is not approved, the ESPP will not become effective and the Prior Plan will continue in effect in accordance with its terms.  The proposed ESPP is attached to this Proxy Statement as Appendix A.

60.     As described in the Company's November 29, 2016, Form 10-K,

Effective March 16, 2016, upon approval by the shareholders of Mallinckrodt, the Company adopted a new qualified Mallinckrodt Employee Stock Purchase Plan ("ESPP").  Substantially all full-time employees of the Company's U.S. subsidiaries and employees of certain qualified non-U.S. subsidiaries are eligible to participate in the ESPP. Eligible employees authorize payroll deductions to be made to purchase shares at 15% below the market price at the beginning or end of an offering period.  Employees are eligible to authorize withholdings such that purchases of shares may amount to $25,000 of fair market value for each calendar year as prescribed by IRC Section 423.  Mallinckrodt has elected to deliver shares under the period by utilizing treasury stock accumulated by the Company.

Prior to the first offering period of the ESPP (July 1, 2016), the Company maintained a non-qualified employee stock purchase plan ("the Old ESPP").  Substantially all full-time employees of the Company's U.S. subsidiaries and employees of certain qualified non-U.S. subsidiaries were eligible to participate in the Old ESPP. Eligible employees authorized payroll deductions to be made for the purchase of shares.  The Company matched a portion of the employee contribution by contributing an additional 15% (25% in fiscal 2014 and fiscal 2015) of the employee's payroll deduction up to a $25,000 per employee contribution. All shares purchased under the Old ESPP were purchased on the open market by a designated broker.

61.     The Company's November 29, 2016, Form 10-K states that "[a]s of September 30, 2016, there were … 4,976,380 ordinary shares subject to purchase pursuant to the Mallinckrodt Employee Stock Purchase Plan."

62.     The Company's April 4, 2018, Proxy Statement further states that "[a]s of December 29, 2017, there were … 4,836,207 ordinary shares subject to purchase pursuant to the Mallinckrodt Employee Stock Purchase Plan."  It further states that, pursuant to a shareholder vote from the prior year, "Ordinary shares subject to the Mallinckrodt Employee Stock Purchase Plan may be unissued shares or reacquired shares."

63.     The Company's January 18, 2017, Proxy Statement discloses that "The Prior Plan was terminated June 30, 2016 upon implementation of the ESPP and no additional shares were offered for purchase under the Prior Plan after that date. The ESPP was implemented effective July 1, 2016.  Eligible employees authorize payroll deductions to be made for the purchase of ordinary shares and, for fiscal 2016 beginning July 1, 2016, we provided a 15% discount for all employees who participated in this program for up to $25,000 of an employee's payroll deductions in the calendar year.  For 2016, shares utilized were Treasury shares and are required to be held by participants for 12 months after purchase."

## THE REGISTRATION STATEMENT

64.     On May 4, 2016, the Company filed with the SEC a Registration Statement registering 5,000,000 shares of Company stock at $61.47 for a total of $ 307,350,000 for employees of the Company who wish to purchase Company stock through the Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan.  The Mallinckrodt Pharmaceuticals 2016 Employee Stock Purchase Plan states in relevant part:

Item 3.

Incorporation of Documents by Reference.

The following documents, which have been filed by the Registrant with the Commission, are incorporated herein by reference (except for any portions of Current Reports on Form 8-K furnished pursuant to Item 2.02 or Item 7.01 thereof and any corresponding exhibits thereto not filed with the Commission):

(a)     The Registrant's Annual Report on Form 10-K for the fiscal year ended September 25, 2015 (Commission File No. 001-35803);

(b)     The Registrant's Quarterly Reports on Form 10-Q for the quarterly periods ended December 25, 2015 and March 25, 2016 (Commission File No. 001-35803);

(c)     The Registrant's Current Reports on Form 8-K filed with the Commission on September 28, 2015, November 27, 2015 and March 22, 2016 (Commission File No. 001-35803).

(d)     The description of the Registrant's Ordinary Shares contained in the Registrant's Registration Statement on Form S-4 filed May 16, 2014 (Commission File No. 333-196054), including any amendment or report filed for the purpose of updating such description.

**All documents filed by the Registrant with the Commission pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act subsequent to the date of this Registration Statement** (other that any such documents or portions thereof that are furnished under Item 2.02 or Item 7.01 of a Current Report on Form 8-K or otherwise, unless otherwise indicated therein, including any exhibits included with such Items), prior to the filing of a post-effective amendment to this Registration Statement that indicates that all securities offered hereby have been sold or which deregisters all securities then remaining unsold, **shall be deemed to be incorporated by reference in this Registration Statement** and to be a part hereof from the date of filing of such documents.

Any statement contained in this Registration Statement or in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Registration Statement to the extent that a statement contained or incorporated by reference herein or in any subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a

part of this Registration Statement. [Emphasis added].

\*       \*       \*

Item 9.

Undertakings.

(a)     The undersigned Registrant hereby undertakes:

(1)     To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement:

(i)     To include any prospectus required by Section 10(a)(3) of the Securities Act;

(ii)     To reflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in this Registration Statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii)     To include any material information with respect to the plan of distribution not previously disclosed in this Registration Statement or any material change to such information in the Registration Statement; provided, however, that the undertakings set forth in paragraphs (a)(1)(i)  and (a)(1)(ii) above do not apply if the information required to be included in a post-effective

amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the Registrant pursuant to Section 13 or Section 15(d) of the Exchange Act that are incorporated by reference in this Registration Statement;

(2)   That, for the purpose of determining any liability under the Securities Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof; and

(3)   To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b)   The undersigned Registrant hereby undertakes that, for purposes of determining any liability under the Securities Act, each filing of the Registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Exchange Act (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Exchange Act) that is incorporated by reference in this Registration Statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(c)   Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling

precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

65.     Upon information and belief, this 2016 ESPP is still effective as there has not been any amendment to this employee stock purchase plan nor have the Company shares inside this employee stock purchase plan been deregistered.

66.     Further, this ESPP was part of the employment agreement between Mallinckrodt and its employees and was designed to provide eligible employees of Mallinckrodt with an opportunity to increase their proprietary interest in the success of the Company by purchasing Mallinckrodt stock from the Company and to pay for such purchases through payroll deductions as one benefit of the employment bargain in consideration of the labor of the employees received by Mallinckrodt.

## **THE DEVELOPMENT AND MARKETING OF ACTHAR BY QUESTCOR**

67.     Acthar, which was originally developed by an affiliate of the Armour & Company meat packing business from the pituitary glands of slaughtered pigs, was first licensed in 1952 by the FDA.  Acthar was the only therapeutic ACTH drug licensed by the FDA for use in the United States.[3]

68.     At the time Acthar was licensed by the FDA, an applicant seeking approval of a new drug was only required to show that it was safe, not that it was also effective for its prescribed uses.  Since that time, the law has changed, and new drugs must be shown to be both

---

[3]     ACTH stands for adrenocorticotropic hormone, which is an adrenal hormone made in the pituitary gland that acts on the adrenal cortex to stimulate the production of steroid hormones.  Acthar is an injected medication that is used to treat several types of conditions, including infantile spasms as well as disorders of the joints, skin, eyes, and respiratory system.  It works by stimulating the outer layer of cells of the adrenal gland, promoting the production of natural hormones that reduce inflammation.  Once injected, it is absorbed into the bloodstream and upon reaching the adrenal gland, steroid hormones (largely cortisol) are produced.

safe and effective.  However, this requirement did not apply to grandfathered drugs like Acthar that were approved prior to the change in the law governing the licensing of pharmaceutical drugs.

69.     In 2001, Questcor acquired Acthar from Aventis Pharmaceuticals for the sum of $100,000, plus modest royalties.  This relatively low price was reasonable as Acthar sold at that time for only $40 per vial, befitting its position as a relatively ancient drug, long off patent protection, that had not been actively marketed by Aventis and prescribed for only a very small number of patients.

70.     After the acquisition of Acthar by Questcor, its new owner embarked upon a new direction for the sale and marketing of the drug and drastically increased the price charged for Acthar, as described below.  Not only did Questcor greatly increase its sales and marketing efforts for Acthar, but it also sought FDA approval for the use of Acthar in treating Infantile Spasms.

71.     The FDA approved a supplemental new drug application for Acthar in the treatment of Infantile Spasms in October 2010.  Coincidentally, the FDA also approved a revised label that included 19 different medical conditions – down from the more than 50 different treatment indications for which Acthar had been previously approved.  According to an October 15, 2010, Questcor release, the 19 indications were organized under the following nine (9) disease states:

> **Infantile spasms**:   H.P. Acthar Gel (repository corticotropin injection) is indicated as monotherapy for the treatment of infantile spasms in infants and children under 2 years of age.
>
> **Multiple Sclerosis**: H.P. Acthar Gel (repository corticotropin injection) is indicated for the treatment of acute exacerbations of multiple sclerosis in adults.  Controlled clinical trials have shown H.P. Acthar Gel to be effective in speeding the resolution of acute exacerbations of multiple sclerosis.  However, there is no evidence

that it affects the ultimate outcome or natural history of the disease

**Edematous State**: To induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus.

**Rheumatic Disorders**:  As adjunctive therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in Psoriatic arthritis, Rheumatoid arthritis, including juvenile rheumatoid arthritis (selected cases may require low-dose maintenance therapy), Ankylosing spondylitis.

**Collagen Diseases**:  During an exacerbation or as maintenance therapy in selected cases of: systemic lupus erythematosus, systemic dermatomyositis (polymyositis). Dermatologic Diseases: Severe erythema multiforme, Stevens-Johnson syndrome.

**Allergic States**: Serum sickness.

**Ophthalmic Diseases**: Severe acute and chronic allergic and inflammatory processes involving the eye and its adnexa such as: keratitis, iritis, iridocyclitis, diffuse posterior uveitis and choroiditis; optic neuritis; chorioretinitis; anterior segment inflammation.

**Respiratory Diseases**: Symptomatic sarcoidosis.

72.     From the time of its acquisition of Acthar in the second half of 2001, Questcor's sales of Acthar increased from $9.0 million and $8.0 million in 2002 and 2003, respectively, to $114.7 million in 2010, and to $761.3 million in 2013.  By that time, Acthar sales accounted for more than 95% of Questcor's total revenues.  Taking advantage of Acthar's monopoly status as the only ACTH drug approved for sale in the United States, the price was increased from $40 per vial in 2001, to around $1,650 per vial by 2006, to more than $23,000 per vial in 2007, and to $28,000 per vial by 2012.

## THE UNLAWFUL EFFORTS TO BLOCK COMPETITION TO ACTHAR AND PRESERVE ACTHAR'S ACTH MONOPOLY

73.     The only potentially competing ACTH product to Acthar in the United States were Synacthen and Synacthen Depot[4] (together, "Synacthen"), which, unlike Acthar, are synthetic compounds made in a laboratory, and thus a potentially more attractive drug whose consistency and purity could be ensured and carefully monitored in the manufacturing process.

74.     Prior to 2013, Synacthen was owned by Novartis AG and was licensed and sold in various other countries and regions, including in Canada and Europe, to treat many of the same conditions for which Acthar was approved in the United States.  However, Synacthen could not be sold in the United States because it had not yet secured the requisite FDA approval, which now required proof that it was both safe and effective via the submission of a new drug application (unlike Acthar, which had been licensed for sale in 1952 based solely on evidence that it was safe).  The U.S. licensing of Synacthen was dependent upon prior completion of adequate testing to prove, to the FDA's satisfaction, both the safety and efficacy for each disease for which it would be used.

75.     The existence of Synacthen, which has the same first 24 amino acids as Acthar, threatened the monopoly held by Questcor, and later, Mallinckrodt, if Synacthen could be offered as an alternative in the United States for the high priced Acthar.  This made Synacthen a very attractive investment to other pharmaceutical companies seeking to challenge Questcor's U.S. monopoly on ACTH-based drugs.

---

[4]     Depot is a drug formulation that allows gradual absorption, over a long period, from a quantity deposited by injection under the skin or in a muscle.

76.     The prospect of competition from Synacthen was keenly appreciated by Questcor, and thereby made the purchase of Synacthen by Questcor critical to preserving the U.S. monopoly in ACTH drugs that was seen as key to the financial success of Questcor.

77.     When Novartis let it be known that it was considering licensing the rights to manufacture and sell Synacthen in the United States, and most of the rest of the world, other than countries for which Novartis had already transferred those rights, a number of prospective acquirers emerged.

78.     At least three companies, other than Questcor, simultaneously negotiated with Novartis to acquire these rights to Synacthen.  However, Synacthen had a unique value to Questcor, as it sought to control this single potentially competing alternative ACTH drug in the United States market by obtaining the exclusive rights to develop, manufacture and sell Synacthen in the United States and many other countries, particularly because Acthar accounted for approximately 95 percent of Questcor's revenues at that time.

79.     Driven by its desire to preserve its monopoly on ACTH medications in the United States, Questcor far outbid the three alternative acquirers and announced that it was successful in acquiring the rights to develop and market Synacthen in the United States and many countries outside the United States in June 2013.  At the time Questcor acquired Synacthen, Questcor' Chief Scientific Officer stated that the company intended to "develop and seek FDA approval for Synacthen" and was "committed to developing this product not only in conditions different than Acthar but also in conditions where Synacthen would potentially provide a clinical benefit over Acthar."

80.     Questcor was acquired by Mallinckrodt in August 2014.  With that transaction, Mallinckrodt acquired ownership of the Acthar franchise as well as the rights to develop

Synacthen in the United States (subject to FDA approval) and to market and sell it in many countries outside the United States where it was already approved.  However, the leadership of Mallinckrodt had no such intention to develop Synacthen in the U.S. market for any indications that could potentially compete with its lucrative Acthar franchise.  Rather, from the time that Mallinckrodt acquired Questcor, Mallinckrodt sought to preserve the unlawful ACTH monopoly and reap monopoly profits from the sale of Acthar by seeking to develop Synacthen for only one medical treatment that did not overlap in any way with any of the treatments for which Mallinckrodt was marketing Acthar.

81.     In so doing, Mallinckrodt engaged in unlawful, anticompetitive, monopolistic conduct in violation of federal antitrust laws.  Mallinckrodt and its executives acted, and throughout the Relevant Period would continue to act, to unlawfully forestall any meaningful competition for its monopoly product, all while making false and materially misleading statements to investors about the "competition" to Mallinckrodt's Acthar products.  Such statements, which are identified and more fully described below, served to create a false impression of the Company's ability to preserve and exploit its monopoly position and resulting profits, and artificially inflated the prices of Mallinckrodt's securities.

82.     In addition, Mallinckrodt and its top executive affirmatively lied to investors regarding the true extent of Acthar's reliance on Medicare and Medicaid by intentionally presenting false data to the market in the fall of 2015 that Acthar was not as dependent on reimbursements from these programs as it actually was.  This fact was crucial to investors, and when they finally learned the truth – that the percentage of Acthar sales paid for by Medicare and Medicaid, rather than private insurance companies, was far higher than the level publicly

reported – the Company's stock price fell, reflecting the greater risk associated with the private insurers' reluctance to pay stratospheric prices for Acthar.

### MALLINCKRODT'S ACTHAR FRANCHISE AND PRACTICES

83.     The hyper-inflation of the price of Acthar triggered an inevitable backlash as insurers and other payers began to push back.  Although there were indications that Questcor had faced some insurer resistance to certain of the uses for which Questcor was selling Acthar, the first revelation of problems with private insurers that impacted Mallinckrodt's bottom line came on August 4, 2015, when the Company reported its third quarter earnings and announced a slight reduction in its sales forecast for Acthar because of pressure from health insurance companies and other payers regarding the drug's exorbitant cost.   During an August 4, 2015 earnings conference call, Defendant Trudeau said that Acthar was facing a more difficult payer environment than the previous year, which was changing the Company's perspective on the long-term prospects for the drug.  As a result, the price of Mallinckrodt stock dropped 14% from $124.21 per share to $106.73 per share, as investors began to question the sustainability of Acthar's pricing, thereby threatening one of the Company's primary sources of revenue and earnings. But Defendants continued to make materially false and misleading statements about the Company's operations relating to Acthar, as well as the Company's ability to obtain reimbursement from private insurers for Acthar sales.

84.     During this same time period, the soaring prices of certain pharmaceutical products was a heavily debated topic, both generally and as it impacted spending by the Government through the Medicare and Medicaid systems.   This understandably led the investment community to seek out information concerning the extent of Acthar's exposure to Medicare and Medicaid.  In response to this questioning during an October 6, 2015 investor presentation, Defendant Trudeau stated that the Company's combined revenues from Medicare

and Medicaid were roughly 25% of Mallinckrodt's total revenues, and that the proportion of Acthar revenues attributable to Medicare and Medicaid was "*maybe a little higher than that*." As would be revealed later in the Relevant Period, Medicare and Medicaid reimbursements actually accounted for *over 60% and over 61%* of the Company's total sales of Acthar in 2014 and 2015, respectively.

85.     The truth about Mallinckrodt's dependence on Acthar sales for its profitability as well as its dependence on Medicare and Medicaid reimbursements for revenue from the sale of Acthar began to surface when Andrew Left, an activist short seller, author and editor of the online investment newsletter *Citron Research* ("*Citron*"), which at the time was best known for exposing fraudulent practices to inflate drug sales at Valeant Pharmaceuticals, tweeted on November 9, 2015, that Mallinckrodt stock had significantly more "downside" than Valeant and was "a far worse offender of the reimb[ursement] sys[tem]."  Valeant had been a notorious case of fraud tied, in part, to massive inflation of prescription drug prices, and resulted in numerous Government investigations, private securities litigation and criminal charges.  By issuing this statement, *Citron* helped to disclose the impact of the wrongdoing by Mallinckrodt, and that it was even greater than the notorious benchmark provided by Valeant, which the market knew had already resulted in substantial harm to investors.

86.     After that *Citron* tweet, shares of Mallinckrodt dropped 17% from $69.89 per share, the closing price of the Company's stock on November 6, 2015, to $58.01 per share at the close on November 9, 2015.  This was the largest one-day drop in the price of the stock since Mallinckrodt was spun-off from Covidien plc in 2013.

87.     *Citron* tweeted another statement on March 15, 2016 underscoring the increasing risk posed by Mallinckrodt's anticompetitive behavior – "Mkt. is starting to realize that $MNK

[Mallinckrodt] equal risk to $VRX [Valeant]." *Citron*'s Andrew Left appeared on CNBC's Fast Money that same day and said that Mallinckrodt made Valeant look like a "choirboy" and referred to Acthar as the "poster child" of price gouging. Left explained: "I think Mallinckrodt is worse [than Valeant] because they are dependent on one drug, close to let's say 50 percent of their EBITDA, depends on what metric you want to look at, is dependent on one particular drug. Not let's say 30 [different drugs] that Valeant has."

88. The significance of Left's observations sent the price of Mallinckrodt stock down by 20% over a two-day period from a close of $69.61 per share on March 14, 2016 to a close of $55.69 per share on March 16, 2016, reflecting the magnitude of this disclosure. But this did not fully disclose the full extent of Defendants' prior materially false and misleading statements, which continued throughout the remainder of the Relevant Period.

89. Of the *Citron* assertions, Mallinckrodt asserted in a Form 10-K on November 29, 2016, and similar representations were made in other SEC filings, that:

> Third parties, some of whom may have taken investment positions that would increase in value if our share price declines ("short sellers"), may make allegations related to our products or business practices. These short sellers make a profit when our shares decline in value, and their actions and public statements, and the resulting publicity, may cause further volatility in our share price. In November 2015, one short seller publicly made assertions regarding Acthar that were not substantiated in any way. In March 2016 the short seller reiterated, again without any substantiation, many of the same assertions. On both occasions, the unsubstantiated assertions attracted media attention and our share price fluctuated. This volatility may cause the value of a shareholder's investment to decline.

90. The true extent of Mallinckrodt's reliance on Acthar's Medicaid and Medicare reimbursements was not revealed until November 16, 2016, when *Citron* published a report based on information displayed on the website of the Centers for Medicare and Medicaid ("CMS") of the United States Department of Health and Human Services on November 14, 2016

(the "*Citron* Report").  The *Citron* Report compared the new information issued by CMS against the statements Trudeau had made during the October 6, 2015 investor presentation.  The *Citron* Report revealed that Medicare and Medicaid paid approximately $504 million and $144.6 million respectively for Acthar in 2015, payments that collectively amounted to over 61% of Mallinckrodt's total sales of Acthar in 2015.  That was a far cry from the 25% or "maybe a little higher" that Trudeau had provided to the market on October 6, 2015.

91.     In response to the issuance of the *Citron* Report disclosing the truth about the overwhelming percentage of Acthar sales attributable to payments by Medicare or Medicaid, rather than private insurance, shares of Mallinckrodt dropped 18.4% from a close of $67.80 per share on November 15, 2016 to a close of $59.65 on November 16, 2016 and to a close of $55.32 per share on November 17, 2016.  But, again, this still did not reveal the full extent of the Company's materially false statements and illegal conduct concerning its marketing and sale of Acthar.

92.     On January 18, 2017, the U.S. Federal Trade Commission ("FTC") and five states charged Mallinckrodt and its Questcor subsidiary with unfair methods of competition and acts of monopolization in violation of the Sherman Act, and announced that the Company and its Questcor division had entered into a Consent Decree to resolve the FTC's charges.  The "FTC Complaint" was filed at the conclusion of the FTC's more than two-year long investigation.

93.     The FTC Complaint laid out the foundation for establishing that Synacthen was a potentially competing ACTH drug to Acthar.  The FTC Complaint pointed out that "[i]n Europe, Canada, and other parts of the world, doctors treat patients suffering from [the] same conditions [treated with Acthar] with Synacthen Depot."  FTC Complaint ¶ 6.  It also asserted that "[i]n 2006, when Questcor decided to pursue an 'orphan' (*i.e.*, high) pricing model for Acthar, it

recognized the potential threat Synacthen posed to Acthar's revenue growth," and that it approached Novartis, the then-current owner of Synacthen, about acquiring Synacthen in 2009. After Questcor failed to acquire the rights to develop and market Synacthen at that time, "Questcor continued to monitor the competitive threat from Synacthen," and ultimately outbid at least three other serious prospects to acquire it.  The FTC Complaint stated in relevant part:

> Unbeknownst to Questcor at the time, Novartis decided in late 2011 to divest exclusive rights to seek FDA approval for Synacthen and commercialize it in the United States, along with the marketing rights for Synacthen in over thirty-five other countries where the drug was already approved and sold.  Dozens of companies contacted Novartis and expressed interest in acquiring Synacthen. Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements.  (FTC Complaint ¶ 41).

> Each of the three firms planned to develop Synacthen for IS [infantile spasms] and/or IMN [idiopathic membranous nephropathy, the single largest cause of a kidney disorder called nephrotic syndrome ("NS")] and use Synacthen to compete directly with Acthar. With approval for one or both of these indications, each firm expected to capture a significant share of the U.S.  ACTH market from Questcor by pricing Synacthen well below Acthar.  Having the requisite pharmaceutical expertise and financing, the three firms independently conducted due diligence, crafted business plans and regulatory approval strategies, and took other affirmative steps in furtherance of developing Synacthen for the U.S. market. (FTC Complaint ¶ 42).

*   *   *

> In October 2012, Questcor learned that at least one unidentified firm was attempting to acquire Synacthen from Novartis and develop it for the United States.  Questcor immediately attempted to reach Novartis and shortly thereafter signed a confidentiality agreement with Novartis and submitted an offer for Synacthen. (FTC Complaint ¶ 46).

> Novartis negotiated with the three alternative bidders in parallel with Questcor.  By the spring of 2013, all three of the alternative bidders had submitted offers for Synacthen, with plans to develop and launch Synacthen in the United States in direct competition with Acthar. (FTC Complaint ¶ 47).

\*          \*          \*

> Unlike the three alternative bidders, Questcor had only inchoate
> plans for Synacthen and conducted limited due diligence when it
> submitted its initial offer to Novartis.  (FTC Complaint ¶ 48).

94.     On the same day the FTC filed the FTC Complaint, the Company entered into a

Consent Decree with the FTC and announced a settlement of its charges.  To settle the FTC

charges, Mallinckrodt was required to pay a $100 million fine to the federal government and to

sub-license certain of its U.S. development rights to Synacthen to a company that would need to

be approved by the FTC.  The sub-license was for two of the primary indications for which

Mallinckrodt has marketed and sold Acthar: Infantile Spasms and Nephrotic Syndrome.

95.     At the time of the announcement of the FTC settlement the Company's stock

dropped 5.85% or $2.89, to a close of $46.53 per share on January 18, 2017, from its previous

close of $49.42 per share on January 17, 2017.

96.     Even following the revelations concerning the true extent of Acthar sales that

were reimbursed by Medicare and Medicaid compared to private insurers and the settlement with

the FTC, Defendants continued to make statements that misled the market with respect to the

long-term prospects for the Company's Acthar sales and served to maintain Mallinckrodt's stock

price at artificially inflated levels.  These included statements concerning Acthar's claimed

growth across the payer mix, strengthened formulary positions, removal or relaxation of previous

formulary restrictions, expansion in terms of the number of commercial lives under contract, and

guidance that was consistently stated and reiterated throughout 2017 for mid-single-digit to low

double-digit growth in net Acthar sales.

97.     The falsity of the Company's statements in this regard came to light when, on

November 7, 2017, the Company reported for the first time in its history that net sales of Acthar

in the quarter had declined from the net sales in the comparable quarter in the prior year.

Specifically, the Company disclosed that its net Acthar sales in the third quarter ended September 29, 2017 were $308.7 million, down by 5.6% from net sales of $327.0 million during the same quarter in 2016.  The Company attributed the sales decline, in part, to a volume decline that resulted from "an increasing number of prescriptions going unfilled beyond the level we had seen previously," and said that the Company expected that fourth quarter 2017 net Acthar sales would also be down sequentially.  Further, in responding during a conference call to one of the many analyst questions concerning the Company's Acthar sales, Defendant Trudeau admitted that Acthar "continues to experience payer pressures" and "we expect those payer pressures to continue to be more challenging.  We expect payers to put more and more hurdles in front of patients getting reimbursement.  […]  The situation that we're experiencing now is this combination of both those payer pressures, plus […]  the additional issue that we're seeing with these patient prescriptions going unfilled at this point."[5]

98.    With these disclosures, the full truth about the Company's Acthar's business was finally revealed.  The price of Company stock fell by 35.5%, falling by $11.07 per share from a closing price of $31.18 on November 6, 2017, to a closing price of $20.11 on November 7, 2017, on enormous volume of over 34 million shares traded.  The Company's stock price has continued to decline, closing at $16.07 on May 17, 2018.

---

[5]     The decline in Acthar sales in the third quarter 2017 from the comparable quarter in 2016 was no fluke.  Confirming that the Company was facing far greater reimbursement issues with private insurers than had been disclosed during the Relevant Period, declining sales have worsened in the fourth quarter 2017 and the first quarter 2018.  Net Acthar sales declined 9.3% in the fourth quarter 2017 compared to the fourth quarter 2016, and they declined 10.3% in the first quarter 2018 compared to the first quarter 2017.

Mallinckrodt used the term "payor" in SEC filings in 2014, but thereafter used the term "payer" in its SEC filings.  Accordingly, unless the term is quoted from a year 2014 SEC filing, this Complaint shall hereafter use the term "payer" rather than "payor," even if a call transcript showed it otherwise.

## MALLINCKRODT'S ACTIONS RELATING TO ACTHAR AND SYNACTHEN

99.     An October 14, 2014 Mallinckrodt Pharmaceuticals Investor Briefing set forth the 19 diseases and/or conditions for which the FDA had approved Acthar and further identified the 9 indications for which Acthar was then being marketed.[6]  The nine approved and marketed uses were:

### Neurology

       Infantile Spasms
       Multiple sclerosis flares in adults


### Rheumatology

       Multiple organs (including muscle and joint):

       Lupus
       Dermatomyositis/polymositis
       Rheumatoid arthritis flares
       Psoriatic arthritis flares
       Ankylosing spondylitis flares

### Pulmonology

       Symptomatic sarcoidosis

### Nephrology

       Edematous state (remission of proteinuria in nephrotic syndrome)

100.    The same list was included in an Investor Briefing dated December 7, 2015, which also included a chart titled "Acthar has low patient penetration across majority of approved indications."  The chart indicated approximately a 50% share of addressable patients treated by Acthar for infantile spasms; approximately an 18% share of addressable patients

---

[6]     Accessible at:
http://phx.corporateir.net/External.File?item=UGFyZW50SUQ9NTU3MTQ5fENoaWxkSUQ9MjU0NzI2fFR5cGU9MQ==&t=1 at 15.

treated by Acthar for multiple sclerosis; approximately 6% and 4% shares of addressable patients treated for proteinuria remissions in idiopathic nephrotic syndrome and rheumatoid arthritis (adjuvant therapy), respectively; and lower amounts for the five other approved and marketed uses.

101.   In the years following the Company's acquisition of Questcor, Mallinckrodt reported increasing net sales of Acthar.   During the six-week period from August 14, 2014 through September 26, 2014 (the end of the Company's fiscal year 2014), its net sales of Acthar were $122.9 million.   Mallinckrodt FY 2014 Form 10-K, at 54-55. During fiscal year 2015, ended September 25, 2015, its net sales of Acthar were $1.0373 billion (compared to total revenues of $3.4569 billion). Mallinckrodt's FY 2015 Form 10-K, at 54, 55.   And during fiscal year 2016, ended September 30, 2016, its net sales of Acthar were $1.1604 billion (compared to total revenues of $3.3808 billion).   Mallinckrodt's FY 2016 Form 10-K, at 43, 51.

102.   At the close of its FY 2014, the Company attributed the increases in its operating income and margins "primarily due to higher net sales of high margin products, such as Acthar and Ofirmev […]," among other reasons.   Mallinckrodt FY 2014 Form 10-K, at 56.   It similarly attributed the increases in the Company's operating income and margins in fiscal year 2015 primarily to the timing of its acquisitions of Acthar, Ofirmev and Inomax.   Mallinckrodt FY 2015 Form 10-K, at 56.[7]

103.   The Company changed its fiscal year to a calendar year so that fiscal year 2017 would be from December 31, 2016 to December 29, 2017.   In announcements pertaining to the

---

[7]   While in neither year did the Company quantify the proportion of operating income stemming from Acthar, it was clearly a very significant product for the Company and its financial and operating results, especially in light of the cessation of the Company's Global Medical Imaging business by June 2015 and the declines in its Generics and Active Pharmaceutical Ingredients (API) business segment that took place after the quarter ended March 27, 2015.

results of the first quarter ended March 31, 2017 and second quarter ended June 30, 2017, the Company reported that its net Acthar sales increased by roughly 9% and 7%, respectively, over net Acthar sales in the first two calendar quarters in 2016. However, when the Company announced its third quarter 2017 results, the reported net Acthar sales were below the net sales in the same quarter in 2016. Specifically, on November 7, 2017, the Company reported that its net sales of Acthar in the third quarter ended September 29, 2017 were $308.7 million, down by 5.6% from net sales of $327.0 million during the same quarter in 2016. Mallinckrodt 3Q2017 Form 10-Q, at 35.

104. And ultimately, for the full fiscal year 2017, the Company reported net sales of Acthar of $1.1951 billion, an increase of only $34.7 million, or 3.0%, over net sales of Acthar over the same four quarters in 2016. Mallinckrodt 2017 Form 10-K, at 50. The Company reported total revenues for the year of $3.2216 billion. Mallinckrodt 2017 Form 10-K, at 46.

105. Although the Company continued not to quantify the proportion of operating income stemming from Acthar sales in 2017, Acthar clearly remained a very significant product for the Company.

106. The Company's reported quarterly net sales of Acthar compared to the Company's total reported revenues, over the period from the quarter ended June 27, 2014 through March 30, 2018, are shown below:

|  | Acthar Net Sales (in Millions of Dollars) | Total Revenue (in Millions of Dollars) |
|---|---|---|
| 06/27/2014 | 0.0[8] | 653.1 |
| 09/26/2014 | 122.9 | 673.1 |
| 12/26/2014 | 266.4 | 768.2 |
| 03/27/2014 | 228.0 | 819.0 |

---

[8]  Mallinckrodt acquired Questcor on August 14, 2014. Accordingly, it had no Acthar sales in the quarter ended June 27, 2014, and less than a full quarter of sales in the quarter ended September 26, 2014.

|  | **Acthar Net Sales (in Millions of Dollars)** | **Total Revenue (in Millions of Dollars)** |
|---|---|---|
| 06/26/2014 | 268.7 | 877.3 |
| 09/25/2014 | 274.2 | 778.8 |
| 12/25/2015 | 286.7 | 811.2 |
| 03/25/2015 | 248.4 | 815.8 |
| 06/24/2016 | 298.3 | 866.6 |
| 09/30/2016 | 327.0 | 887.2 |
| 12/30/2016 | 325.4 | 829.9 |
| 03/31/2017 | 271.8 | 810.9 |
| 06/30/2017 | 319.4 | 824.5 |
| 09/29/2017 | 308.7 | 793.9 |
| 12/29/2017 | 295.2 | 792.3 |
| 03/30/2018 | 243.8 | 572.6[9] |

107.    As shown in the chart, the net sales figures for Acthar suffered declines starting in the third quarter 2017 and continuing through the first quarter 2018 when compared to the same quarters in the prior years.  Specifically, net Acthar sales of $327.0 million in the third quarter 2016 fell to $308.7 million in the third quarter 2017 (a 5.6% decline); net Acthar sales of $325.4 million in the fourth quarter 2016 fell to $295.2 million in the fourth quarter 2017 (a 9.3% decline); and net Acthar sales of $271.8 million in the first quarter 2017 fell to $243.8 million in the first quarter 2018 (a 10.3% decline).  At the start of this period, in early September 2017, a seminal report was published in the *Journal of the American Medical Association* ("JAMA") that included a detailed study of prescription trends from 2011 through 2015 relating to Acthar, based in large part on the Medicare reimbursement payment data that was first made available on November 14, 2016.[10]    Among other things, the study showed, with detailed charts, that

---

[9]    This figure excludes $182.7 million in net sales attributed in the 1Q2018 Form 10-Q from the Specialty Generics Disposal Group, which by then met the criteria as a Discontinued Operation. For comparison purposes, the Specialty Generics Disposal Group contributed $250.9 million in net sales in the quarter ended March 31, 2017, which when taken out of total revenues earlier reported for the quarter ended March 31, 2017, brings that figure to $560.0 million.

[10]    Daniel M. Hartung, *PharmD, MPH, et al.*, "Trends and Characteristics of US Medicare Spending on Repository Corticotrophin," JAMA Internal Medicine, Vol. 177, No. 11, at 1680 (Nov. 2017); accessible                                                                                                                            at:

relatively few prescribers (in 2014, 0.2% of prescribers) in the fields of rheumatology, neurology and nephrology accounted for much of Medicare's spending for Acthar (in 2014, 42% of all Acthar spending).  It similarly found that despite comprising fewer than 0.5% of their total prescriptions, Acthar accounted for more than one-third of total Medicare Part D expenditures for the frequent specialist prescribers.  Further, in reply to the letter from Mallinckrodt's Chief Medical Officer, the study authors wrote that while Acthar has been found to be effective for infantile spasms and to treat relapses of multiple sclerosis, "the remainder of studies, as summarized in the review cited by Dr. Otulana, are of low quality, consisting primarily of case series, small uncontrolled single-arm studies, and several observational studies of health care utilization."  As a result, they wrote: "Given the preponderance of small and uncontrolled single arm studies, we have serious doubts that these studies will provide scientific evidence sufficient to justify use of Acthar at its current price."

108.    During the third quarter 2017 earnings call held on November 7, 2017,[11] Defendant Trudeau said that "Acthar sales growth slowed in the quarter impacted by both the comparison against 2016 with an additional selling week and a volume decline."  He attributed the volume decline to the fact that "as the third quarter progressed, we saw an increasing number

---

https://jamanetwork.com/journals/jamainternalmedicine/articleabstract/2653010?redirect=true.  The study was cited in Linette Lopez, "The most respected medical journal in the US just eviscerated a drug that's cost taxpayers over $1 billion," *Business Insider* (Sept. 12, 2017); accessible at: https://finance.yahoo.com/news/most-respected-medical-journal-us-142905444.html.  Dr. Tunde Otulana, Mallinckrodt's Chief Medical Officer, wrote a response, "Uses of H.P. Acthar Gel in the Clinical Setting," that was published in JAMA Internal Medicine, Vol. 128, No. 4, at 583 (April 2018), that also included a reply by Hartung, et al.  When the initial study was published, JAMA Internal Medicine also published an editorial, "New (Very High) Prices on Old Drugs," JAMA Internal Medicine, Vol. 177, No. 11, at 1568 (Nov. 2017); accessible at: https://jamanetwork.com/journals/jamainternalmedicine/articleabstract/2653007?widget=personalizedcontent&previousarticle=2653010&redirect=true.

[11]    Accessible at:
https://www.nasdaq.com/aspx/calltranscript.aspx?StoryId=4121687&Title=mallinckrodt-plc-mnk-q3-2017-results-earnings-call-transcript .

of prescriptions going unfilled beyond the level we had seen previously," which the Company anticipated would take time to work through, leading to the expectation that fourth quarter 2017 Acthar net sales would also be down sequentially. And, in responding to one of the many analyst questions concerning the Company's Acthar sales, Trudeau admitted that Acthar "continues to experience payer pressures" and "we expect those payer pressures to continue to be more challenging. We expect payers to put more and more hurdles in front of patients getting reimbursement. […] The situation that we're experiencing now is this combination of both those payer pressures, plus additional the additional issue that we're seeing with these patient prescriptions going unfilled at this point."

109.   The payer pressures on Acthar sales was also discussed in ensuing quarterly earnings calls. As previously anticipated, the Company confirmed on the fourth quarter 2017 earnings call that Acthar sales in the fourth quarter 2017 were down sequentially from those in the fourth quarter 2016 for reasons similar to those stated on the November 7, 2017 call.

110.   However, on the first quarter 2018 earnings call held on May 8, 2018, while claiming that the Company had "made headway in stabilizing Acthar payer access" and would "continue to recover from the residual Acthar patient withdrawal issues from last year," Defendant Trudeau admitted that there were continuing payer pressures experienced with Acthar treatments, including when payers try to restrict the length of therapy for Acthar. Defendant Harbaugh further admitted that the Company's Acthar sales in the first quarter 2018 "were down 10% driven by lower volumes."

111.   Through its acquisition of the exclusive rights to develop, produce and market Synacthen products in the United States, Questcor achieved – and Mallinckrodt later acquired – a monopoly ACTH position for Acthar in the U.S. market. The FTC Complaint against

Mallinckrodt and its Questcor division detailed the dramatic price increases that the companies imposed for the price of Acthar, from $40 per vial in 2001 to over $34,000 per vial in 2017, an 85,000 percent increase, which were depicted graphically in Linette Lopez, "An Illinois city just stepped into the war against big pharma over drug pricing," *Business Insider* (Apr. 7, 2017).[12]

---

[12]    Accessible at: http://www.businessinsider.com/rockford-sues-mallinckrodt-over-acthar-price-2017-4. A report titled "The problem with prescription drug prices" aired on 60 Minutes on May 6, 2018, which corroborates that although the bulk of the price increases for Acthar took place before the merger of Questcor into Mallinckrodt, the Company has raised the price by about $8,000 per vial since acquiring Questcor. Accessible at: https://www.cbsnews.com/news/the-problem-with-prescription-drug-prices/. The 60 Minutes reporter asked Dr. Peter Bach, who studies the cost and value of drugs at Memorial Sloan Kettering in New York, to look into Acthar. Among other things, Dr. Bach observed that while Acthar is considered to be an effective treatment for Infantile Spasms, there is no evidence that the FDA would consider convincing as to its effectiveness for the diseases that seniors are taking it. He further observed that many of the doctors who prescribed a lot of Acthar "also were getting money from the company that makes Acthar, for speaking, for consulting, for running research studies for the company, adding up to huge sums. And those doctors appear to be the ones who are most likely to also prescribe Acthar." Dr. Bach further stated: "They're using a time-tested strategy, they raise the price to a very high level and they concentrate their energies on a few doctors whom they can get to prescribe the drug. And it works great for their revenue. It doesn't help patients. And in 2015, it added up to half-a-billion dollars of expenses for Medicare."



112.     The FTC Complaint further noted that typically a course of Acthar treatment for patients with infantile spasms requires multiple vials, costing over $100,000 for one course of treatment.  Acthar is one of the most expensive drugs on the market today and it is the single most expensive drug reimbursed by both Medicare and Medicaid.

113.     The FTC Complaint asserted that Questcor had illegally acquired the U.S. rights to develop Synacthen Depot, and that the acquisition "stifled competition by preventing any other company from using the Synacthen assets to develop a synthetic ACTH drug, preserving Questcor's monopoly and allowing it to maintain extremely high prices for Acthar." In announcing the settlement, the FTC's Chairwoman stated: "We charge that, to maintain its monopoly pricing, it acquired the rights to its greatest competitive threat, a synthetic version of Acthar, to forestall future competition. This is precisely the kind of conduct the antitrust laws

prohibit." In addition to the $100 million payment, the FTC settlement also required Mallinckrodt to grant a license to develop Synacthen to treat Infantile Spasms and Nephrotic Syndrome – two of the primary uses for Acthar – to a licensee approved by the FTC.

114.    In January 2007, Defiante, a subsidiary of Sigma-Tau, had acquired from Novartis the rights to market and distribute Synacthen in 19 countries, primarily in Europe (Austria, Belgium, France, Germany, Greece, Ireland, Italy, Luxembourg, Poland, Portugal, Spain, Netherlands, United Kingdom, Finland, Sweden, Denmark and Norway) and also in China and India. Sigma-Tau describes the uses of Synacthen on its website,[13] as follows:

> Synacthen contains the active ingredient tetracosactide. Synacthen can be used diagnostically to assess adrenal function and also, in some cases, as a treatment for certain diseases of the central nervous system.
>
> Synacthen is a synthetic protein (polypeptide) which mimics the body's natural adrenocorticotropic hormone (also known as corticotropin or ACTH).
>
> Synacthen is primarily used for diagnostic purposes to investigate adrenal function in cases where the adrenal cortex is suspected not to be functioning properly. In some circumstances, Synacthen can also be used for the treatment of certain diseases of the central nervous system, namely acute exacerbation of multiple sclerosis (MS) and West syndrome, where infants with an abnormal EEG scan (a recording of brain activity) suffer spasms (episodes of involuntary muscular contractions).

Notably, Mallinckrodt's two marketed uses of Acthar for neurologic treatments – "multiple sclerosis flares in adults" and "infantile spasms" – match the uses that Sigma-Tau identifies on its website for Synacthen.

115.    The following chart summarizes the uses for which Synacthen has been approved in certain other countries, indicating by use of an asterisk (*) the countries in which Mallinckrodt

---

[13]      Accessible at: http://sigma-tau.nl/en/geneesmiddelen//#synacthen.

owns the marketing rights.  The chart confirms the FTC's charge that "[i]n Europe, Canada, and other parts of the world, doctors treat patients suffering from [the] same conditions [treated with Acthar] with Synacthen Depot."  FTC Complaint ¶ 6.

| Country | Indications |
|---|---|
| United Kingdom | Diagnostic test for the investigation of adrenocortical insufficiency |
| Ireland | Diagnostic test for the investigation of adrenocortical insufficiency |
| Australia (*) | Diagnostic test for the investigation of adrenocortical insufficiency |
| Turkey (*) | Neurological diseases such as multiple sclerosis, hypsarrhythmia infantile myoclonic encephalopathy; rheumatic diseases; skin diseases such as pemphigus, severe chronic eczema, psoriasis, erythrodermal or pustular forms; diseases of the digestive system such as ulcerative colitis and regional enteritis; and an adjunctive therapy to increase the tolerability of chemotherapy |
| Canada (*) | 17 conditions including: acute exacerbations of multiple sclerosis, rheumatoid arthritis, lupus erythematosus, bell's palsy, ulcerative colitis, psoriatic arthritis, scleroderma, nephrotic syndrome, and adjuvant treatment in cases of acute gout |
| Germany | Infantile epilepsy (West Syndrome) |
| Romania (*) | Diagnostic test for the investigation of adrenocortical insufficiency; and treatment of acute multiple sclerosis episodes; certain types of seizures in children; rheumatic diseases; short-term treatment of conditions where corticosteroids are commonly used; skin disorders that respond to corticoids; ulcerative colitis and Crohn's disease; and adjuvant treatment in cancer patients to increase tolerability to chemotherapy |
| Singapore (*) | Anterior pituitary lobe hormone and analogue preparations |
| New Zealand (*) | Diagnostic test for the investigation of adrenocortical insufficiency; and treatment of Multiple Sclerosis ("MS") and West Syndrome; rheumatic diseases; in patients showing poor gastrointestinal tolerance of oral glucocorticoids; skin diseases such as pemphigus, severe chronic eczema, erythrodermal or pustular forms of psoriasis; diseases of the gastrointestinal tract such as ulcerative colitis; regional enteritis; and as an adjuvant therapy to improve the tolerability of chemotherapy |
| Sweden | Diagnostic test for the investigation of adrenal cortex function; and treatment of neurological diseases and infantile spasms |
| Italy | Diagnostic test for adrenal cortex function; and treatment of neurological disorders including MS and infant myoclonic encephalopathy with hypsarrhythmia; in patients with poor gastrointestinal tolerance to glucocorticoids; skin diseases including pemphigus, severe chronic eczema, pustular or erythrodermal psoriasis; diseases of the gastrointestinal tract including ulcerative colitis, regional enteritis; oncology as an |

| Country | Indications |
|---------|-------------|
| | adjuvant to improve tolerability to chemotherapy; and nephropathi |
| Chile (*) | Adrenocortical insufficiency and for the treatment of conditions that respond to glucocorticotherapy but in which oral glucocorticoid therapy has poor gastrointestinal tolerability; neurological conditions (acute outbreaks of MS, childhood myoclonic encephalopathy with hypsarrhythmia; rheumatic diseases; dermatosis (pemphigus, severe chronic eczema, erythrodermic or pustular forms of psoriasis); oncology: as a coadjuvant to improve the tolerability of chemotherapy |
| Slovenia (*) | Diagnostic test for adrenal cortex sufficiency |
| Finland | Diagnostic test for adrenal cortex sufficiency |
| Poland | To help control the function of and stimulate the adrenal cortex; rheumatoid arthritis; chronic skin diseases such as pemphigus or exfoliative dermatitis in ulcerative colitis; Crohn's disease; MS; and in the advanced stages of cancer |
| Cuba (*) | Rheumatic diseases; poor gastrointestinal tolerability of glucocorticosteroids; neurological affections: acute outbreaks of MS, myoclonic encephalopathy, and infant with hypsarrhythmia (West Syndrome); chronic dermatoses that respond tocorticosteroids such as pemphigus, dermatitis or chronic eczema severe, erythrodermic or pustular forms of psoriasis; gastrointestinal diseases including ulcerative colitis and regional Crohn's disease, and as a coadjuvant in oncology |
| Netherlands | Diagnostic test for adrenal sufficiency; acute aggravation in MS or spasm attacks (seizures of involuntary muscle contractions) in small children with a deviant EEG image (West syndrome) |
| Portugal | Diagnostic test for adrenal sufficiency; neurological disorders: acute exacerbations in patients with MS, childhood encephalopathy syndrome with hypsarrhythmia; rheumatic diseases: short-term therapy in pathologies for which glucocorticoids are generally indicated; in patients with reduced gastric tolerance to glucocorticoids; in cases where glucocorticoids do not allow an adequate response; skin diseases: prolonged treatment of skin disorders that respond to glucocorticoids, e.g. pemphigus, severe chronic eczema, erythrodermic forms and pustular psoriasis; diseases of the gastrointestinal tract: ulcerative colitis; regional enteritis; and oncology: as adjuvant therapy for improving tolerability to chemotherapy |
| Russia (*) | Diagnostic test for adrenal sufficiency; MS (exacerbation); infantile myoclonic encephalopathy with hyperaritis; rheumatic diseases and diffuse diseases of connective tissue (with intolerance of oral administration of SCS, inadequate efficiency of GCS); true pemphigus, true eczema of severe chronic course, psoriasis |

44

| Country | Indications |
|---|---|
|  | (erythrodermic or pustular form); ulcerative colitis, isolated enteritis, kidney disease (nephrotic syndrome); and as an additional means for improving the tolerability of chemotherapy in cancer disease |
| Brazil (*) | Diagnostic test for adrenal sufficiency; neurological disorders: acute exacerbations in patients with MS and childhood encephalopathy and hypoarrhythmia; rheumatic diseases: short-term therapy in pathologies for which glucocorticoids are generally indicated; in patients with reduced gastric tolerance to glucocorticoids; in cases where glucocorticoids, do not allow an adequate response; skin diseases: prolonged treatment of skin disorders that respond to glucocorticoids, for example: severe chronic eczema, erythrodermic forms and pustular psoriasis; diseases of the gastrointestinal tract: ulcerative colitis; regional enteritis; and oncology: as adjuvant therapy for improving tolerability chemotherapy |
| France | Diagnostic test for adrenal sufficiency |

116. From the time of its acquisition of Questcor in August 2014 to the present, Mallinckrodt has not sought FDA approval for any of the uses for which Synacthen was approved in these and other countries outside the United States. Rather, on or about June 14, 2016 – nearly two years after Mallinckrodt completed its acquisition of Questcor – Mallinckrodt submitted an Investigational New Drug (IND) application for Synacthen Depot to the FDA, seeking to pursue licensure of Synacthen solely for the treatment of DMD.

117. Several months later, by early September 2016, the FDA granted "Fast Track" designation to Mallinckrodt's IND application for Synacthen Depot to treat DMD. In commenting on the designation, Mallinckrodt's Chief Scientific Officer ("CSO"), Dr. Steve Romano, said the Company was pleased with the FDA's determination and was "happy to report the first patients have been dosed in the initial Phase 1 trial." As of today, however, the use of Synacthen Depot for the treatment of DMD has not been approved, and the Company had not completed the required testing that would allow for any such approval. Rather, in a Mallinckrodt Pharmaceuticals: Investor Briefing 2017 Presentation, Research and Development, which was

presented by Dr. Romano on October 4, 2017,[14] MNK-1411 (the Company's designation for Synacthen) is mentioned only in the "Development Pipeline" and the only indication for which MNK-1411 is being evaluated is for patients with DMD.

118.   DMD is not one of the indications for which Acthar has been approved by the FDA for treatment, and not one of the indications for which the Company has marketed Acthar in the United States.   Thus, even if Mallinckrodt becomes successful in obtaining approval of its IND application for Synacthen to treat DMD at some point in the future, that would not create any competition whatsoever with the Company's sales of Acthar for any of the uses for which Mallinckrodt has marketed Acthar in the United States.

119.   The Company's failure to seek to develop Synacthen for use in the United States to compete against Acthar – as Questcor's CSO had stated was at least part of that company's intent at the time Questcor purchased the rights to develop Synacthen in the U.S. market from Novartis in June 2013 – and potentially cause a decrease in the price of Acthar for any of its primary uses, corroborates the antitrust violations charged by the FTC and was likely the reason why the FTC required Mallinckrodt to enter into a sub-licensing agreement so that another company would have the ability to develop Synacthen for at least two of its primary marketed treatments – Infantile Spasms and Nephrotic Syndrome.

120.   The Company's decision not to develop Synacthen for any use that might compete with Acthar is confirmed by the Company's former Vice President of Global Pharmacovigilance ("Former VP"), who served in that position at Mallinckrodt from early January 2013 until September 30, 2016.   Former VP also served as the Acting Chief Medical

---

[14]      Accessible at:
http://phx.corporateir.net/External.File?item=UGFyZW50SUQ9NjgwMzE3fENoaWxkSUQ9Mzg5NzA0fFR5cGU9MQ==&t=1.

Officer from approximately mid-2015 to early 2016.  Former VP initially reported to Tom Smith, who was Mallinckrodt's Chief Medical Officer until he left the Company.  Former VP thereafter reported primarily to the Company's Chief Scientific Officers, Mario Saltarelli until he left the Company and then Steven Romano, but during the latter portion of Former VP's tenure with the Company, he reported to a new Chief Medical Officer, Tunde Otulana.

121.    Former VP noted that Synacthen was acquired from Novartis by Questcor and was on the market in over 50 countries around the world, other than the United States, when Questcor was acquired by Mallinckrodt.  While the outside word was that Mallinckrodt was going to develop Synacthen for some indication, Former VP believes, based on the positions held with the Company and interactions with others at the Company, that Mallinckrodt's management "were careful quite honestly because they didn't want it to compete with Acthar because the pricing scheme (for Synacthen) was considerably different."  At the time, Synacthen was basically a drug costing only a few dollars a vial in the overseas market for indications that overlapped with Acthar.  Former VP believes that had another company developed Synacthen for the U.S. market, it would have become widely used given its very similar amino acid sequences and because it would have been much cheaper than Acthar.  That is why, according to Former VP, Mallinckrodt management "dragged their feet.  They were going to discuss it to death.  They put very little effort into developing Synacthen in the US."

122.    Former VP further related that Mallinckrodt had to submit dossiers by certain timeframes in order to satisfy the license agreement with Novartis, otherwise Novartis would have had the option to take the drug back.  That led to Mallinckrodt submitting an IND but, according to Former VP, there were few resources attached to it.  "So, to call it an active development program would have been a gross overstatement."

123.   Former VP further related that while Synacthen development was not a priority at Mallinckrodt, any decisions on its development ultimately resided with the Mallinckrodt Executive Committee.  The CSO would have had significant input into Synacthen development, and CEO Trudeau would have to approve any such plan.   While Former VP and others (including Mario Saltarelli, the CSO for a while; the Head of Project Management; the Head of Research and Development; and various clinical team leaders) had meetings concerning Synacthen, ultimately Mallinckrodt devised a game plan and settled on an indication for DMD in order to submit an IND (Investigational New Drug Application) and then put together a program to hit a timeline to submit the NDA (New Drug Application) for FDA approval.

124.   Former VP also related that the scientific group made presentations about the Synacthen development plans to the Mallinckrodt Executive Committee.  But overall, there were not very many resources, *i.e.*, people devoted to Synacthen development, especially compared to Acthar.  Thus, in Former VP's view, given that Synacthen was a drug with lots of approval in many places and a long history overseas, Mallinckrodt should have been able to put together a program tailored to the FDA for submission within a few months of an IND for several indications – in addition to the one that was submitted for DMD – including some that may have competed with Acthar, rather than waiting for nearly two years to file the IND for the one indication (DMD) with the FDA.

125.   The Company's intent to maintain its unlawful monopoly of ACTH medications is further borne out by Mallinckrodt's June 2015 settlement of allegations made in a complaint filed against Questcor by another one of the bidders for the Synacthen license.  *Retrophin, Inc. v. Questcor Pharmaceuticals, Inc.*, No. 8:14-cv-00026-JLS-JPR (C.D. Cal., filed Jan. 7, 2014) ("Retrophin Complaint").  The Retrophin Complaint alleged that in June 2013, Retrophin was

poised to challenge Questcor's ACTH Acthar monopoly, stating that it (a) had negotiated an agreement to purchase the U.S. rights to Synacthen from Novartis, (b) "planned to obtain FDA approval to sell Synacthen in the US to and compete head to head against Questor [sic] by undercutting Questcor's price for Acthar," and (c) was scheduled to sign a purchase agreement on June 11, 2013.  Retrophin Complaint ¶¶ 4-6.  However, as alleged by Retrophin, Questcor swooped in at the last minute and acquired the rights to Synacthen.

126.     Rather than seeking to challenge Retrophin's allegations on the merits, on June 4, 2015, pursuant to a Confidential Settlement Agreement and Release, Mallinckrodt, through Questcor Pharmaceuticals, which was now a wholly-owned and operated subsidiary, agreed to settle the litigation.  Under the terms of the Settlement Agreement, Questcor paid Retrophin $15.5 million in exchange for a release of all claims by Retrophin.[15]

127.     While not competing in any way with any of the treatment indications for which Acthar is sold in the United States, Mallinckrodt's development of Synacthen Depot to treat DMD would, however, appear to satisfy certain terms in the License Agreement that Questcor entered into with Novartis in 2013, when it acquired the rights to develop and market Synacthen Depot in the U.S. market.  Under the License Agreement, which has an Effective Date of June 11, 2013, Questcor was required to pay Novartis $60 million on the Effective Date, and to pay $25 million on each of the first three anniversary dates (*i.e.*, June 11, 2014, 2015 and 2016), which payments were required to be secured by a $75 million bank guarantee.  These required payments, totaling $135 million, were required to be paid even if the License Agreement was later voided for antitrust reasons.

---

[15]       *See* https://www.sec.gov/Archives/edgar/data/1438533/000119312515215608/d938504d8k.htm.

128.   The License Agreement further provided – without disclosing the amounts of payments in the published version of the Agreement – that Questcor was required to make "milestone payments" upon each subsequent anniversary of the Effective Date until such time that Questcor (or any affiliate or sub-licensee) secured the first approval of a product derived from Synacthen Depot from the FDA for use in the United States, when it would owe other types of royalty payments.  As stated in the License Agreement, Novartis could require a termination of the License Agreement if Questcor did not make any of the required payments and did not reach a set of "Development Milestones" with certain time periods that are not specified in the public version of the Agreement.

129.   Despite the fact that Mallinckrodt identified Synacthen Depot as among "[t]he most significant [three] development products in our pipeline include … in the U.S." in its November 29, 2016, Form 10-K, the development to the filing of this Complaint – nearly four years after Mallinckrodt acquired the rights to develop Synacthen Depot in the U.S. market – of just one application to the FDA for a treatment that would not compete with Mallinckrodt's sales of Acthar was part and parcel of Mallinckrodt's unlawful, yet undisclosed scheme to violate U.S. antitrust laws and charge increasing prices for Acthar.  The Company developed Synacthen Depot for only the treatment of DMD so that it would have no impact whatsoever on Mallinckrodt's ability to charge highly excessive prices for its primary Acthar treatment indications – Infantile Spasms, Nephritic Syndrome, Rheumatology Related Conditions, and Multiple Sclerosis.  Indeed, it is telling that when the FTC agreed to settle its antitrust claims against Mallinckrodt, it required the Company to license to another company the rights to develop Synacthen Depot for the treatment of Infantile Spasms and Nephritic Syndrome, two of its primary sales indications.

130.     Pursuant to the FTC settlement, on or about July 16, 2017, Mallinckrodt granted a license to West Pharmaceuticals, giving it the right to develop and pursue possible FDA approval of Synacthen Depot in two indications – Infantile Spasms (IS) and Nephritic Syndrome (NS), along with the exclusive rights to the Synacthen trademark in the U.S.   Under its license agreement with West, Mallinckrodt retained the rights to continue manufacturing and marketing Synacthen to patients in other countries around the world, where the Company already has rights, and it can also develop the product for all other indications in the United States.   To date, the Company has not sought FDA approval for any other uses of Synacthen.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE RELEVANT PERIOD

131.     The Relevant Period begins on July 14, 2014, when Questcor and Mallinckrodt each filed a joint definitive proxy statement with the SEC in anticipation of the shareholder votes on the pending merger.   In no portion of the joint proxy statement did either company disclose the existence of the FTC investigation or subpoena received by Questcor from the FTC on June 11, 2014.   Instead, the definitive proxy listed a litany of risk factors for Mallinckrodt relating to Acthar and Synacthen, as follows:

> These factors include risks and uncertainties related to, among other things: general economic conditions and conditions affecting the industries in which Mallinckrodt and Questcor operate; the commercial success of Mallinckrodt's and Questcor's products, including H.P. Acthar® Gel; Mallinckrodt's and Questcor's ability to protect intellectual property rights; the parties' ability to satisfy the merger agreement conditions and consummate the merger on the anticipated timeline or at all; the availability of financing, including the financing contemplated by the debt commitment letter, on anticipated terms or at all; Mallinckrodt's ability to successfully integrate Questcor's operations and employees with Mallinckrodt's existing business; the ability to realize anticipated growth, synergies and cost savings; ***Questcor's performance and maintenance of important business relationships; the lack of patent protection for Acthar, and the possible FDA approval and market introduction of additional competitive products***;

Questcor's reliance on Acthar for substantially all of its net sales and profits; Questcor's ability to continue to generate revenue from sales of Acthar to treat on-label indications associated with nephrotic syndrome, multiple sclerosis, infantile spasms or rheumatology-related conditions, and Questcor's ability to develop other therapeutic uses for Acthar; volatility in Questcor's Acthar shipments, estimated channel inventory, and end-user demand; an increase in the proportion of Questcor's Acthar unit sales comprised of Medicaid-eligible patients and government entities; Questcor's research and development risks, including risks associated with Questcor's work in the areas of nephrotic syndrome and Lupus, and Questcor's efforts to develop and obtain FDA approval of Synacthen Depot; Mallinckrodt's ability to receive procurement and production quotas granted by the DEA; Mallinckrodt's ability to obtain and/or timely transport molybdenum-99 to Mallinckrodt's technetium-99m generator production facilities; customer concentration; cost-containment efforts of customers, purchasing groups, third-party payors and governmental organizations; Mallinckrodt's ability to successfully develop or commercialize new products; competition; Mallinckrodt's ability to achieve anticipated benefits of price increases; Mallinckrodt's ability to integrate acquisitions of technology, products and businesses generally; product liability losses and other litigation liability; the reimbursement practices of a small number of large public or private issuers; complex reporting and payment obligations under healthcare rebate programs; changes in laws and regulations; conducting business internationally; foreign exchange rates; material health, safety and environmental liabilities; litigation and violations; information technology infrastructure; and restructuring activities.

132.    The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose material adverse facts pertaining to Mallinckrodt's future business prospects and operations which were then known to Defendants and/or recklessly disregarded by them.  Specifically, Defendants failed to disclose that Acthar's financial viability was largely dependent upon the continuation of monopolistic and anticompetitive actions that Mallinckrodt intended to take, which were aimed at preventing a synthetic version of ACTH from entering the U.S. market, including specifically that Mallinckrodt did not intend to develop Synacthen for any uses that might compete with Acthar sales.

133.    The statements referenced above were also materially false and/or misleading because Defendants failed to disclose that on June 11, 2014, approximately two months before the scheduled shareholder votes on the merger and one month before the issuance of the joint proxy statement, Questcor had received a subpoena and Civil Investigative Demand ("CID") from the FTC, seeking documentary materials and information pertaining to an FTC investigation into whether Questcor's acquisition of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen from Novartis violates the antitrust laws. Questcor was clearly aware of the subpoena and CID from the FTC. It was sent to Questcor and the Company received it.

134.    Mallinckrodt claimed in the joint proxy statement that its Board of Directors ("Board"), after consultation with the Company's "management, legal advisors, financial advisors and other representatives," considered many factors in making its determination that the Merger Agreement and other transactions contemplated by the Agreement were fair to and in the best interests of Mallinckrodt and its shareholders.    Joint Proxy Statement at 105-106. Mallinckrodt's Board further represented that its recommendation to shareholders was based on Strategic and Financial Considerations, the Merger Agreement, Implied Ownership, the Opinion of its Financial Advisor, ***the Recommendation by Mallinckrodt Management***, Governance, Familiarity with the Industry and Businesses, and ***Due Diligence***.  On the latter point, the Joint Proxy Statement (page 107) cited to the scope of the Due Diligence that had been conducted as a reason for the merger recommendation, as follows:

> The scope of the due diligence investigation of Questcor conducted by Mallinckrodt management and outside advisors and consultants (***which included in-depth reviews*** of organizational, operational, financial, commercial, ***regulatory, legal***, employee and other matters), and the results of that investigation.

135.    Indeed, even after the Mallinckrodt-Questcor merger was consummated, Mallinckrodt's management continued to tout the due diligence it had performed in advance of presenting the proposed merger with Questcor to Mallinckrodt shareholders.  On September 8, 2014, in response to an analyst question, Hugh O'Neill, then-President of Mallinckrodt's Autoimmune and Rare Diseases operations, whose jurisdiction included Acthar, stated that the Company had conducted "across the board" due diligence concerning Questcor and Acthar, "from the way the product is manufactured, to the way the product is sold, to the way the product is actually positioned for reimbursement."  Thus, it is inconceivable that Defendants did not know that the FTC had already started an investigation into whether Questcor's acquisition of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen from Novartis violated the antitrust laws, which also would have put Mallinckrodt on notice that its actions with respect to the development of Synacthen would be the subject of the on-going investigation.

136.    Nevertheless, the Company failed to disclose in the joint proxy statement, or at any other time prior to the consummation of the merger, the fact that the FTC had issued a subpoena and CID for documents and commenced an investigation into these subjects. As Gretchen Morgenson later wrote in a column in the *New York Times* after the FTC settlement was announced: "as Mallinckrodt shareholders weighed whether to approve the deal [with Questcor], they received company filings that detailed the risks in the acquisition.  Nowhere did the F.T.C. subpoena come up – it was the proverbial dog that did not bark."[16]  In fact, the pendency of the FTC's investigation went undisclosed for another five and one-half months,

---

[16]     Gretchen Morgenson, "A Costly Drug, Missing a Dose of Disclosure," *The New York Times* (Jan. 27, 2017), accessible at: https://www.nytimes.com/2017/01/27/business/gretchen-morgenson-mallinckrodtdrug-disclosures.html.

even though in the interim Mallinckrodt filed one quarterly Form 10-Q, and nine (9) separate Form 8-K reports.

137.   The definitive proxy statement was also materially false and misleading because, while the companies noted "Questcor's performance and maintenance of important business relationships" and "Questcor's efforts to develop and obtain FDA approval of Synacthen Depot" constituted potential risks facing Questcor, in the spring of 2014, which was *before* the joint proxy statement was issued, *the sole worldwide manufacturer of Synacthen and Synacthen Depot had informed Questcor that it would cease manufacturing the product in April 2016, due to a planned decommissioning of its sole production site*, which would require Questcor and Mallinckrodt to identify and initiate production with a new manufacturer.

138.   This fact came to light only after Mallinckrodt was heavily criticized for engaging in alleged price gouging in Canada when, starting in early 2015, Mallinckrodt increased the price of Synacthen products it was selling in Canada.  Specifically, in January or February 2015 – approximately six months after the Questcor was merged into Mallinckrodt – the Company raised the price of Synacthen Depot (Cosyntropin) in Canada from C$33.66 per vial to C$801.19 per vial.  As a result, the cost of the required six-week treatment for Infantile Spasms (also called West Syndrome) "skyrocketed from about C$750 to almost C$17,000."[17]   The September 24,

---

[17]   *See* Deron Hamel, "2,000% price hike on infantile spasms medication 'predatory behaviour': Neurologist," Epilepsy Ontario (Sept. 24, 2015), accessible at: http://epilepsyontario.org/2000-price-hikeon-infantile-spasms-medication-predatory-behaviour-neurologist/.   The article reported that Toronto's Hospital for Sick Children and the Ontario Drug Benefit program negotiated the price down to $680 per vial, so that the treatment course would cost $14,280 rather than the full almost $17,000. Synacthen is distributed in Canada pursuant to a distribution agreement with Valeo Pharma Inc., a Canadian specialty pharmaceutical company.  *See* Valeo Pharma announces Distribution Agreement for Synacthen® Depot in Canada (Feb. 19, 2015), accessible at: https://www.prnewswire.com/news-releases/valeo-pharmaannounces-distribution-agreement-for-synacthen-depot-in-canada-292687721.html.

Mallinckrodt also raised Synacthen prices in other countries in which the Company held the exclusive rights to develop, market and sell Synacthen and Synacthen Depot.  For example, Ruud Helwig,

2015 article in *Epilepsy Ontario* further reported that the most effective treatment for Infantile Spasms in Canada is Synacthen Depot (Cosyntropin), and that without prompt and effective treatment, an infant will develop severe neurological and cognitive impairments. Dr. Carter Snead, a pediatric neurologist, was quoted in the article as saying that the 2,000 percent price increase on a medication to treat Infantile Spasms was "predatory behavior" and that Mallinckrodt had done "absolutely nothing to justify this huge price increase."

139.    Other similar articles followed.  An article by Rebecca Robbins entitled "How a price hike for a drug for infants with epilepsy drove an uproar," was published by *Stat News* on November 17, 2015.[18]  The article noted that others had also written about the 2,000 percent price hike for the Synacthen product that Mallinckrodt was then selling in the Canadian market. CBC News issued a story on November 16, 2015 entitled "2,000% price hike for infant seizure drug called 'absurd.'"[19]  The written posting of the report noted that because the price hike was so high, from C$33.05 per vial to C$680 per vial, Alberta Health officials delisted it in July 2015, although it could still be provided on a case-by-case basis, and health officials in three other provinces reported similar increases.

---

General Manager, International, for Mallinckrodt ARD, wrote a letter dated January 19, 2015, to Alltherm Sa, concerning "Important changes" with respect to Synacthen and Synacthen Depot products then being sold in Switzerland.  "The objective of this letter is to inform you of the need to increase the price of Synacthen & Synacthen Depot (a synthetic ACTH analogue) to ensure the long-term supply of the product for patients in Switzerland."  Among other things, the letter further stated that long-term supply concern arose from notice given by the current sole worldwide manufacturer of Synacthen & Synacthen Depot, of its inability to supply the product beyond April 2016 due to a planned manufacturing site decommission.    The    letter    is    accessible    at: http://sgedssed.ch/fileadmin/files/6_empfehlungen_fachpersonen/65_medikamenteninfos/Info_Synacthen _price_change_letter_2015.pdf.

[18]        Accessible at: https://www.statnews.com/2015/11/17/infants-epilepsy-drug-price/.

[19]        Accessible at: http://www.cbc.ca/news/health/infantile-seizures-drug-1.3318183.

140.    In an apparent reaction to these and the other articles, Mallinckrodt issued a news release on November 17, 2015, which publicly disclosed the following:

> *In the spring of 2014 the existing European manufacturer of the products announced it would cease manufacturing the product in April 2016 – requiring Mallinckrodt to identify and initiate production with a new manufacturer.*

Thus, whereas Questcor and Mallinckrodt knew of the fact that the sole worldwide manufacturer of Synacthen and Synacthen Depot would be unable to supply the product beyond April 2016 due to a planned manufacturing site decommission, they merely reported as a risk that Questcor might not be able to maintain "important business relationships" and that it faced risks surrounding its "efforts to develop and obtain FDA approval of Synacthen Depot."

141.    In addition to the materially false statements in and omissions from the joint proxy statement issued July 14, 2014, Defendants made a series of false and materially misleading statements about the Company's competitive position pertaining to Acthar.   On November 25, 2014, the date Mallinckrodt filed its 2014 Form 10-K with the SEC, the Company stated that Acthar "*has limited direct competition due to the unique nature of the product*" and that its "*commercial durability therefore relies partially upon product formulation trade secrets, confidentiality agreements and trademark and copyright laws*." (emphasis added). The 2014 Form 10-K also stated that:

> [F]ollowing our acquisitions of Cadence and Questcor, both of which were completed in fiscal 2014, we expect that a small number of products, most notably Acthar and to a lesser extent, Ofirmev, will represent a significant percentage of our net sales. Our ability to maintain and increase net sales from these products depends on several factors, including:
>
> •    our ability to increase market demand for products through our own marketing and support of our sales force;
>
> •    our ability to implement and maintain pricing actions and continue to maintain or increase market demand for these

products;

- our ability to maintain confidentiality of the proprietary know-how and trade secrets relating to Acthar;

- our ability to maintain and defend the patent protection and regulatory exclusivity of Ofirmev;

- our ability to continue to procure a supply of Acthar and Ofirmev from internal and third-party manufacturers in sufficient quantities and at acceptable quality and pricing levels in order to meet commercial demand;

- our ability to maintain fees and discounts payable to the wholesalers and distributors and group purchasing organizations, at commercially reasonable levels;

- whether the Federal Trade Commission ("FTC"), Department of Justice ("DOJ") or third parties seek to challenge and are successful in challenging patents or patent-related settlement agreements or our sales and marketing practices;

- warnings or limitations that may be required to be added to FDA approved labeling;

- the occurrence of adverse side effects related to or emergence of new information related to the therapeutic efficacy of these products, and any resulting product liability claims or product recalls; and

- our ability to achieve hospital formulary acceptance and maintain reimbursement levels by third-party payors.

Moreover, net sales of Acthar may also be materially impacted by the decrease in the relatively small number of prescriptions written for Acthar as compared to other products in our portfolio, given Acthar's use in treating rare diseases. Any disruption in our ability to generate net sales from Acthar could have an adverse impact on our business, financial condition, results of operations and cash flows.

142.    Substantially the same statements were made in the Company's 2015 Form 10-K and 2016 Form 10-K.

143.    The Company's 2014 Form 10-K failed to disclose the fact that the Company's increasing reliance on Medicare and Medicaid for over 60% of Acthar's sales meant that the Company was highly exposed to changes in reimbursement levels for these programs.  As such, this statement created a materially false and misleading impression of the true nature of, and specific risks to Mallinckrodt due to its exposure to Medicare and Medicaid reimbursement levels.

144.    The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Acthar's "limited direct competition" and "commercial durability" were due to Questcor's illegal anticompetitive conduct in preventing a synthetic version of ACTH to reach the U.S. market, a practice that Mallinckrodt initially followed, but later would later be forced to abandon.

145.    The risk disclosures referenced above created a materially false and misleading impression of the true nature of, and specific risks to, Mallinckrodt due its exposure to Medicare and Medicaid reimbursement levels.  As the *Citron Report* revealed on November 16, 2016, Medicare spending in 2014 on Acthar totaled over $391 million, representing over 45% of Acthar sales.  The *Citron Report* further revealed that combined 2014 Medicare and Medicaid spending on Acthar was over $518 million, representing over 60% of Acthar sales.  Therefore, the Company faced extreme exposure to reductions in reimbursement levels by these programs. As a result, the Company's statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

146.     On October 6, 2015, the Company held a conference call with analysts and investors.  During the call, Defendant Trudeau touted growth in Acthar sales, which he described as one of the Company's "key initiatives."  Trudeau stated that one of the "key levers" to Acthar sales growth was "further developing key payer relationships."  This conference call included the following exchange:

> **Jason M. Gerberry**: Hi. Thanks for taking the question. Sorry if I missed this, but is the tax rate guidance for this year something that you view as a sustainable number in the absence of M&A or how should we be thinking about the tax line?  And then just as a quick follow-up, can you just remind us?  What is your Acthar exposure to Medicare? Thanks.

> **Mark C. Trudeau**:  So with regards to your question on Medicare exposure to Acthar, a couple of things. One, if we look at our overall business, the combined proportion of our business that goes through Medicare and Medicaid combined *it's about a quarter of our business*, roughly.  *Acthar is maybe a little bit higher than that. But in general, our business is about a quarter*. [Emphasis added].

147.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that the Company's "business model" and "long term growth strategy" was actually contingent on illegal, anticompetitive conduct in preventing a synthetic version of ACTH to reach the U.S. market, a practice that Mallinckrodt would later be forced to abandon.  Moreover, as the *Citron Report* revealed on November 16, 2016, the percentage of Acthar sales for 2014 attributable to Medicare alone was over 45%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid was over 60%. Furthermore, Defendants failed to disclose that the total percentage of Acthar sales attributable to Medicare increased in 2015, with sales attributable to Medicare alone totaling 48%, and the total

percentage of Acthar revenue attributable to both Medicare and Medicaid totaling 61%.  As a result, Defendant Trudeau's statements that the combined proportion of the Company's business that goes through Medicare and Medicaid was materially false and misleading as it was in fact 61%, not 25%.

148.   On November 24, 2015, the Company filed its 2015 Form 10-K for the year ended September 25, 2015,, in which it again stated that Acthar "has limited direct competition due to the unique nature of the product" and that "Acthar's commercial durability . . . relies partially upon product formulation trade secrets, confidentiality agreements and trademark and copyright laws."  The 2015 Form 10-K also contained similar risk disclosures as the 2014 Form 10-K. The 2015 Form 10-K was incorporated by reference into the Registration Statement.

149.   The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Acthar's "limited direct competition" and "commercial durability" was in fact due to Questcor's illegal anticompetitive conduct in preventing a synthetic version of ACTH to reach the U.S. market, a practice that Mallinckrodt continued but would later be forced to abandon.

150.   The risk disclosures referenced above created a materially false and misleading impression of the true nature of, and specific risks to, Mallinckrodt due to its exposure to Medicare and Medicaid reimbursement levels.  As the *Citron Report* revealed on November 16, 2016, the percentage of Acthar sales for 2014 attributable to Medicare alone was over 45%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid was over 60%.  Moreover, the total percentage of Acthar sales attributable to Medicare increased in 2015,

with sales attributable to Medicare alone totaling 48%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid totaling 61%.  Therefore, the Company faced extreme exposure to reductions in reimbursement levels by these programs.  As a result, the Company's statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### THE INADEQUATE DISCLOSURE OF THE MALLINCKRODT'S ANTICOMPETITIVE BEHAVIOR AND THE EVIDENCE IT WAS AWARE OF THE PENDING FTC LITIGATION

151.    With regard to all of the materially false and misleading statements identified above, the Company's belated disclosures that it was under investigation for violations of federal antitrust law by the FTC in the 2014 Form 10-K, filed on November 25, 2014, and in subsequent Forms 10-K, did not constitute an adequate disclosure or correction in the Registration Statement to the market of the actions that Mallinckrodt was undertaking as a result of its intended suppression of any Synacthen-based competition for its Acthar franchise.  Instead, the 2014 Form 10-K merely stated:

> Questcor has received a subpoena and a Civil Investigative Demand ("CID") from the Federal Trade Commission ("FTC") seeking documentary materials and information regarding the FTC's investigation into whether Questcor's acquisition of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen Depot from Novartis violates antitrust laws. We are in the process of responding to each of the subpoenas [from the DEA, FTC and U.S. Attorney's Office] and the CID and we intend to cooperative fully in each such investigation.

Mallinckrodt 2014 Form 10-K, at 113.

152.    The Company repeated this statement of its intention to cooperate in each of the Forms 10-K for the 2015 and 2016 fiscal years, adding that the Company was not aware of any "existing or pending litigation" in connection with the investigations and that an ultimate resolution "could have a material adverse effect on its [Mallinckrodt's] financial condition,

results of operations and cash flows." *See* Mallinckrodt 2015 Form 10-K, at 118; Mallinckrodt 2016 Form 10-K, at 112.  This statement of a risk facing the Company was not sufficient to provide the market with actual information about the Company's intent and internal actions, which are summarized above, and reflect Mallinckrodt's continuing course of conduct in violation of the antitrust laws.

153.   Finally, as alleged above, the FTC filed its Complaint and the Consent Decree with the U.S. District Court for the District of Columbia on January 18, 2017.  The Company's disclosures made on November 29, 2016, in the Company's 2016 Form 10-K, stated that the Company was "not aware of any existing or pending litigation in connection with these investigations."  But, by then, all indications are that the FTC would have informed Mallinckrodt that it was pursuing the investigation into a more serious realm, and it is hard to imagine that the Company was not in negotiations with the FTC for at least several months in advance of the January 18, 2017 FTC settlement and fine.

154.   Among other things, the FTC's litigation processes can be gleaned by reviewing the FTC Operating Manual ("Operating Manual" or "FOM").  The Operating Manual "is distributed to all professional and designated support staff in the Commission, and covers most Commission activities."  FOM Chapter One, §§ .1.1. & .1.2.1.  FTC staff is advised "to follow the procedures outlined in the OM [Operating Manual] unless circumstances warrant modification."  FOM Chapter One, §.1.1.

155.   The FOM provides that "[t]he proposed respondent will ordinarily be contacted during the course of the investigation to obtain information and should be advised of the general nature of the inquiry including the statutes and the alleged violations involved."  FOM Chapter Three § .3.6.1.  It further provides that "[o]rdinarily, the use of investigational subpoenas or

CIDs contemplates the convening of an investigational hearing with testimony under oath and the preparation of a transcript."  FOM Chapter Three § .3.6.7.5.1.  "For each type of CID, the Commission is required to state in the demand, 'the nature of the conduct constituting the alleged violation […] and the provisions of law applicable to such violation.'"  FOM Chapter Three, § .3.6.7.5.3.

156.    The Operating Manual also specifically directs the procedures to be followed in negotiations toward a consent resolution prior to the filing of a complaint.  "It is the policy of the Commission to make this opportunity [to settle] available during or upon completion of the investigation […] as well as during adjudication […]."  FOM Chapter Six, § .3.  The Operating Manual makes clear that FTC staff must have adequately developed the facts before offering a consent agreement:

> Before offering a consent agreement to a proposed respondent or submitting to the Commission at the conclusion of an investigation a settlement offer by proposed respondent, the staff should have developed sufficient facts to determine:
>
> (1)    the nature and gravity of the practices and of any violations that result;
>
> (2)    the appropriate complaint charges and order provisions; and to conclude;
>
> (3)    whether the public would be adequately protected by the proposed relief.

FOM Chapter Six, §.3.1.

157.    This means that before the FTC staff could have proposed or considered a consent agreement with Mallinckrodt, it must have "developed sufficient facts" bearing on the seriousness of the antitrust violation emanating from Questcor's acquisition of the rights to Synacthen and Mallinckrodt's continuing anticompetitive practices relating to Acthar. The negotiation process also involves significant involvement by the professional leadership of the

FTC and accompanying delay.  The Operating Manual directs that "[i]t is advisable for the staff not to engage in intensive consent order negotiations without prior consultation with the Assistant Director, Regional Director, program advisor in BCP [Bureau of Consumer Protection], or Assistant to the Director in BC [Bureau of Competition]."  FOM, Chapter Six, § .3.2.  Moreover, when negotiations result in agreement between the staff and proposed respondent, the proposed agreement is to be submitted to the Director of the Bureau of Competition for review prior to execution.  FOM Chapter Six, § .9.1.

158.   Upon approval of the draft and execution of an agreement by staff, copies of the signed consent agreement, supporting memorandum and other necessary material shall be forwarded to the Director of the Bureau of Competition within 30 calendar days, and any action by the Bureau of Competition on the staff recommendation shall be completed within 35 calendar days.  FOM Chapter Six, § .9.1.  The staff then forwards a consent agreement to the Commission for review and approval.  FOM Chapter 6, § .10.

159.   Accordingly, as a matter of FTC practice, the proposed complaint and consent order would have been provided to Mallinckrodt, in draft and then in final form, well in advance of the announcement of its public filing on January 18, 2017.  The complaint and consent decree include detailed findings, provide for a $100 million fine, and require that Mallinckrodt license the rights to develop Synacthen for treatments of Infantile Spasms and Nephrotic Syndrome – all of which must have been the subject of extensive negotiations between the FTC and Mallinckrodt.

160.   All of this indicates that Mallinckrodt must have been aware of this pending litigation by the time of the filing of the 2016 Form 10-K report on November 29, 2016 – a mere fifty (50) days before the filing of the FTC complaint and the Company's consent decree.  Thus,

Defendants' statement in the Form 10-K issued on November 29, 2016, that the Company "*is not aware of any* existing or *pending litigation in connection with these investigations*" was materially false and misleading for this reason.

### THE COMPANY'S AND DEFENDANT TRUDEAU'S STATEMENTS CONCERNING THE EXTENT OF ACTHAR SALES REIMBURSED BY MEDICARE AND MEDICAID WERE MATERIALLY FALSE AND MISLEADING

161.    A key metric viewed by investors in Mallinckrodt during the Relevant Period concerned the percentage of Acthar sales that were reimbursed by private insurers versus the percentage of sales that were reimbursed by Medicare and Medicaid.  Indeed, in the risk section of the Joint Definitive Proxy for the proposed merger of Questcor into Mallinckrodt, issued on July 14, 2014 – the start of the Relevant Period – the companies included, as a potential risk factor, "an increase in the proportion of Questcor's Acthar unit sales comprised of Medicaid-eligible patients and government entities," which indicated that having more government reimbursements compared to private insurer reimbursements would be detrimental to the Company's business and future prospects.

162.    On October 6, 2015, Mallinckrodt held a guidance call with investors.  During that call, Jerry Gerberry of Leerink Partners asked the question: "What is your Acthar exposure to Medicare?"  In response, Defendant Trudeau asserted:

> So with regards to your question on Medicare exposure to Acthar, a couple of things.  One, if we look at our overall business, the combined proportion of our business that goes through Medicare and Medicaid combined it's about a quarter of our business, roughly.  Acthar is maybe a little higher than that.  But in general, our business is about a quarter.

163.    This statement was materially false when made because it misrepresented in a material way the total percentage of Acthar sales attributable to Medicare and Medicaid.  As later revealed in data released for the years 2011 through 2015 by the CMS on November 14, 2016,

and in a *Citron* Report of November 16, 2016, the Company's Acthar sales that were reimbursed by Medicare and Medicaid was over 61% of the Company's total 2015 Acthar sales, it had been **over 60%** of Questcor's and the Company's total 2014 Acthar sales, and it had been **over 45%** of Questcor's total 2013 Acthar sales.  Each of these figures was materially higher than the 25% and "maybe a little higher than that" that Trudeau stated on October 6, 2015.

164.    In 2015, prescription drug spending outpaced all other health care services and drove up healthcare spending overall.  There was growing controversy over the rising prices of pharmaceuticals – the issue was the focus on Congressional hearings and a hot topic on the presidential campaign trail.  In November 2015, U.S. Senators Susan Collins and Claire McCaskill launched an investigation into companies that bought medicines and then raised prices to previously unforeseen levels.  Valeant Pharmaceuticals and Turing Pharmaceuticals among the companies targeted.  On December 9, 2015, a hearing on drug prices was held in order to examine the huge spikes in drug prices that were seemingly unrelated to the research and development costs of these drugs.  At the same time, several U.S. House of Representative members formed the Affordable Drug Pricing Taskforce to examine drug pricing.

165.    As a result of this outcry, the CMS created an online dashboard to increase transparency and address affordability of prescription drugs.  As stated on the CMS's website: "The 2015 Medicare Drug Spending Dashboard is an online interactive tool that presents drug spending and utilization information on certain Medicare Part B drugs (drugs administered in doctors' offices and other outpatient settings) and Medicare Part D drugs (drugs patients generally administer themselves)."  For the Dashboard, CMS identified 80 drugs using 2015 data that met certain criteria: 40 drugs provided through the Medicare Prescription Drug Program under Part D and 40 drugs administered by physicians and other professionals in the Medicare

fee-for-service program under Part B.  The following criteria was used to select the drugs: the drug is ranked in the top 15 in terms of total program spending (for either Part B or D); the drug is associated with a high annual per user spending based on claims data analyses (*i.e.*, greater than $10,000 per user) and is ranked in the top 15 by overall program spending (and not already selected by the prior criterion); or the drug is ranked among the top 10 high unit cost increases (and not already selected by the either of the prior two criteria).  Acthar was one of the products that met the CMS's criteria and was included in the study.

166.    The CMS data from this initiative was first presented publicly in data issued on November 14, 2016.

167.    A chart titled Medicare Drug Spending 2011-2015 was included in the CMS data,[20] which showed dramatic increases for Medicare spending for Acthar from 2011 through 2015, as follows.

| 2011 | H.P. Acthar | $49,456,910.88 |
| 2012 | H.P. Acthar | $141,451,607.58 |
| 2013 | H.P. Acthar | $262,581,602.41 |
| 2014 | H.P. Acthar | $391,189,652.63 |
| 2015 | H.P. Acthar | $503,999,371.37 |

168.    The CMS data relating to Acthar further showed that Total Annual Spending Per User had increased over the same time period:

| $57,979.97 |
| $89,356.67 |
| $108,013.82 |
| $133,420.75 |
| $162,370.93 |

---

[20]    The CMS data is accessible at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Information-on-Prescription-Drugs/2015Medicare.html.

169.    Thus, as reported in a *Business Insider* article of February 16, 2017, Medicare spent an average of $162,371 on each Acthar patient in 2015.[21]  The article further reported that while Medicare Part D spent over $5 billion on Acthar in 2015, which constituted reimbursement for only 3,104 patients.

170.    CMS similarly reported on Medicaid spending data. There, a chart entitled Medicaid Drug Spending 2011-2015 included the following information under the heading Total Spending:

| 2011 | H.P. Acthar | $40,007,316.65 |
| 2012 | H.P. Acthar | $57,409,698.41 |
| 2013 | H.P. Acthar | $83,938,623.82 |
| 2014 | H.P. Acthar | $126,837,119.09 |
| 2015 | H.P. Acthar | $144,565,870.89 |

171.    Two days later, on November 16, 2016, the extent of the Company's reliance on Medicare and Medicaid reimbursements for Acthar came to light when *Citron* published a report accusing the Company and Defendant Trudeau of securities fraud in connection with Trudeau's representations – made during the Company's October 6, 2015 conference call – regarding the percentage of Acthar sales for which Mallinckrodt received Medicare and Medicaid reimbursement. The *Citron* Report utilized the recently released CMS data and compared it with the Company's reported sales of Acthar.  Based on that analysis, and contrary to Defendant Trudeau's representation in October 2015 that Acthar sales attributed to Medicare and Medicaid were "maybe a little higher" than 25% of the Company's total Acthar sales, the *Citron* Report presented that sales attributable to Medicare and Medicaid combined constituted 61% of

---

[21]    Lopez, Linette, "We dug into the drug company Martin Shkreli sold out to the feds, and man is it ugly," *Business Insider*, Feb. 16, 2017 (accessible at: http://www.businessinsider.com/achtar-drug-showsflaws-in-drug-pricing-payment-system-2017-2).

Mallinckrodt's overall sales. The report, which was captioned, "Mallinckrodt CEO FRAUD exposed by the new Medicare Drug Dashboard," began as follows:

> Mallinckrodt CEO Mark Trudeau has been caught red handed committing securities fraud -- exposed by none other than the newly released Medicare drug spending dashboard.
>
> This long-promised, just released public information database demonstrates that HP Acthar Gel is The Single Most Expensive Drug per Treatment as reimbursed by Medicare/Medicaid.

172.    The *Citron* Report continued by noting that in response to "public outcry and pressure to search for systemic reimbursement abusers" which, according to *Citron*, had reached a tipping point in October 2015 with the collapse of Valeant Pharmaceuticals, the CMS had started to work on an online drug spending dashboard by December 2015 and the results had just been made public earlier in the week.   After quoting Trudeau's statement of October 6, 2015 about the proportion of Mallinckrodt's business "that goes through Medicare and Medicaid combined," the *Citron* Report stated:

> As we now learn, the concentration for Acthar paid by Medicare **has ballooned to 61% as Trudeau lied to Wall Street.**
>
> At the time, Trudeau must have calculated the investing public would never know the damning truth, but only two months later in response to public outrage, this information was on its way to being revealed to the public.
>
> For the year 2015, Medicare and Medicaid Spending is not merely "a little bit" higher than 25%. In fact, it is over 61% of Acthar sales. [Emphasis in original.]

173.    The *Citron* Report included the following chart detailing Acthar spending by Medicare and Medicaid over the years 2011 through 2015, which showed that the percentage of Acthar sales that were reimbursed by Medicare and Medicaid was significantly higher than 25% in each of the years since Mallinckrodt had acquired Questcor, coming in at 45.51% in 2013, 60.20% in 2014 and at 61.32% in 2015.

**H.P. Acthar CMS Spending**

| (in millions) | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| H.P. Acthar Spending by Medicare (CMS) | $49,457 | $141.452 | $262.582 | $391.190 | $503.999 |
| y/y growth | | 186.01% | 85.63% | 48.98% | 28.84% |
| | | | | | |
| H.P. Acthar Spending by Medicaid (CMS) | $40.007 | $57.410 | $82.939 | $126.837 | $144.566 |
| y/y growth | | 43.50% | 46.21% | 51.11% | 13.98% |
| | | | | | |
| **Total H.P. Acthar spending combined (CMS)** | **$89.464** | **$198.861** | **$346.520** | **$518.027** | **$648.565** |
| y/y growth | | 122.28% | 74.25% | 49.49% | 25.20% |
| | | | | | |
| **% of Acthar Revenue by CMS** | **41.01%** | **39.05%** | **45.51%** | **60.20%** | **61.32%** |
| **Calculated cost per beneficiary by Medicare** | **$57,980** | **$89,357** | **$108,014** | **$133,421** | **$162,371** |
| y/y growth | | 54.12% | 20.88% | 23.52% | 21.70% |
| | | | | | |
| **Calculated cost per beneficiary by Medicaid** | **$41,458** | **$44,060** | **$41,533** | **$45,331** | **$44,102** |
| y/y growth | | | | | |
| | | | | | |
| **Combined Calculated cost** | **$49,210** | **$68,906** | **$77,835** | **$90,406** | **$101,624** |

174.   The *Citron* Report further indicated that Acthar represented a more significant portion of the Company's business than had been disclosed previously.  Specifically, the *Citron* Report stated: "Let's not forget that Acthar continues to represent a massively disproportionate chunk of Mallinckrodt's bottom line a number that Trudeau is happy to dance around, rather than disclose the true concentration of risk it took on when it levered up massively to acquire this never-proven drug."

175.    Following the release of the *Citron* Report, the price of the Company's stock fell 18.4%, from a closing price of $67.80 on November 15, 2016, to a closing price of $55.32 on November 17, 2016.  This drop wiped out $1.31 billion in Mallinckrodt's market capitalization.

176.    On November 17, 2016, the day after the *Citron* Report was issued, Mallinckrodt participated in the Jefferies London Healthcare Conference, at which Coleman Lannum, the Company's Senior Vice President, Investor Strategy and IRO, and Daniel Speciale, Director, Investor Relations, spoke and presented slides. Although the Company's investor relations executives brought and discussed a series of slides that were presented at the Conference, including a slide showing comparisons of Acthar net sales between quarters in calendar year 2014 vs. 2013, 2015 vs. 2014, and 2016 vs. 2015, not a single slide was presented that contradicted the percentages of Acthar revenues paid through Medicare and Medicaid during the years 2013 (45.51%), 2014 (60.20%) and 2015 (61.32%) that had been included in the *Citron* Report.  Nor did Lannum or Speciale provide any such precise figures relating to the Company's Acthar sales, which Lannum noted was "our largest single product."

177.    Following Lannum's presentation, and after reference by the moderator to the *Citron* Report ("there was a report out yesterday basically questioning the level of reimbursement for Acthar"), Lannum was asked, "can you disclose what percentage of Acthar sales are collectively, at this point, reimbursed by Medicare and Medicaid?" Lannum responded:

> So if you take a look at our core exposure of Acthar for ***Medicare, it's somewhere in the mid-40s percent range.  If you take it to Medicaid, it's probably in the mid-single digit range. Similar numbers last year***, if you go back two years, these are – by the way, these are all fiscal year numbers – we're on a September fiscal year – if you go back a couple of years, the exposure's a lot lower in Medicare. It's probably in the mid-30s.  Again, with a mid-single digit, maybe a little bit higher kind of Medicaid impact.

(emphasis added).

178.    These figures, of course, are significantly higher than the 25%, or "maybe a little higher," that Trudeau provided to investors in October 2015 for the percentage of Acthar sales that were going through Medicare and Medicaid combined – thereby constituting an admission that the prior figures were absolutely and objectively false. Moreover, Lannum couched his answer to this question – which he and the entire senior management team at Mallinckrodt must have known would be posed at the Conference – in very loose terms, saying the Medicare figures were "somewhere" within a mid-40s range and Medicaid payments were "probably" in the mid-single digit range. But he further admitted that the same figures held for the year before, *i.e.*, when Trudeau presented his answer on October 6, 2015. Thus, even taking Lannum's statements at face value, they show that Trudeau's 25% or "maybe a little higher" representation of the Company's combined Medicare and Medicaid sales as a percentage of total Acthar sales was materially and significantly understated, as shown by Lannum's admission that the figures were in the "mid-40s range" plus in the "mid-single digit range," which add up to the low-50s percent range.

179.    Lannum sought to explain the growth in the percentage of Acthar sales through Medicare by saying that a lot of the product's growth had come in the rheumatology and the pulmonology areas, and that with diseases like rheumatoid arthritis or sarcoidosis, "you tend to get a much older patient population." As a result, "because those areas are growing for us very, very quickly, we've had a lot more exposure to Medicare over that period of time." He further sought to explain the discrepancies by stating that because of the natures of the diseases being treated, "you're talking about a relatively low number of patients here," and because of the "wide degree of indications that the product has, you get different growth rates in different product areas, some of which will be very oriented towards commercial pay and some of which will be

oriented towards the government pay side." But, of course, he nonetheless admitted that the ranges that he was providing at the Conference as Medicare and Medicaid percentages of total Acthar sales in November 2016 had *"[s]imilar numbers last year*," which means that they were at least in the low-50s percent range when Trudeau said they were 25% or "maybe a little higher than that."

180. On November 29, 2016, before the market opened, Mallinckrodt released results for its fourth fiscal quarter 2016 ended September 30, 2016 and hosted an investor call. Present on the call for the Company were Trudeau, Harbaugh, and O'Neill, as well as CSO Romano and Lannum. During the call, Trudeau stated that the Company's Acthar's sales had continued to grow and that the Company had seen "continued growth particularly in rheumatology, pulmonology and nephrology." He also stated: "Infantile spasms, intensified efforts to ensure that infants afflicted with this condition have access to Acthar brought consistent market share gains across the past several quarters." He further stated that as the Company expanded access in pulmonology and rheumatology, "our patient mix has shifted more toward older patients, many of whom are covered by Medicare."

181. Chris Schott, an analyst from JP Morgan, questioned the Company's product concentration, to which Defendant Trudeau responded: "So while our long-term objective is to have no single product account for more than a third of our operating income, currently our concentration has increased a bit. And certainly, Acthar now represents a significantly greater proportion of our operating income than a third." In responding to this question, Defendant Trudeau did not provide any actual percentages of the portion of Acthar sales that went through Medicare and Medicaid. Nor did Trudeau contradict the percentages in the *Citron* Report.

182.    Trudeau further sought to explain, in response to another question about historical penetration levels, as follows: "this business, when we took it on a couple of years ago, was predominantly a neurology business and now it's starting to evolve much more into a pulmonology and rheumatology business."  But Trudeau's statement is belied by Mallinckrodt's Investor Briefing dated October 14, 2014, which, at slide 18, shows approximately the same Acthar Net Revenue in fiscal year 2014 from Neurology, Nephrology, and Rheumatology.  It is true that Rheumatology shows a more significant increase, but to say the business was "predominantly a neurology business" was a further misleading statement, which Trudeau apparently made to provide cover for his clearly materially false statement of October 6, 2015.

183.    Near the end of the earnings call, Defendant Trudeau sought to clarify that:

> historically the business has been partitioned roughly 30% in neurology, 30% rheumatology, 30% nephrology, and then the balance everything else, predominantly pulmonology.  What we can clearly see is the percentages are growing for rheumatology, so now it's higher than 30%.  The percentage of neurology is actually declining a bit and nephrology is roughly holding static, and we're seeing growth also occurring in the pulmonology business.  So, that kind of gives you some perspective on the mix of business.

But all of that does not explain why Trudeau's statement made just one year before, on October 6, 2015, that the level of Acthar sales that were paid by Medicare and Medicaid combined was 25% or "maybe a little higher" was so wrong for each of the years 2013, 2014 and 2015, as shown through a comparison of the CMS data first made public on November 14, 2016, and the Company's historical reported results.

184.    Upon the disclosures made by Mallinckrodt and its executives on November 29, 2016 the price of the Company's stock dropped 9.1% from a close of $57.67 per share on November 28, 2016, to a close of $52.42 per share on November 29, 2016.  This drop wiped out an additional $550 million from Mallinckrodt's market capitalization.

185.    The following day, on November 30, 2016, Harbaugh and O'Neill, and CSO Romano participated at a Piper Jaffray Healthcare Conference.   During that conference, the Company continued to seek to explain away the falsity of Trudeau's October 6, 2015 statements regarding Mallinckrodt's Medicare and Medicaid exposure.   At that conference, O'Neill stated: "Our portfolio has shifted a little bit into the mid-40s as it relates to Medicare reimbursement for the product versus where it was a year and a half, two years ago which was more in that low, mid-30s."   What O'Neill did not answer was why Trudeau – while responding to a question about Medicare reimbursements – affirmatively and intentionally presented data for combined Medicare and Medicaid reimbursements, and then misrepresented as "maybe a little higher" than 25% the combined reimbursement percentage when, in the years 2014 and 2015, the actual figures were over 60% and over 61% according to the *Citron* Report of November 16, 2016, and in the low 50's percent range as admitted by Coleman Lannum, the head of Mallinckrodt Investor Relations, on November 17, 2016.

186.    On August 4, 2015, Mallinckrodt reported financial results for the quarter ended June 26, 2015.   Mallinckrodt not only reported revenue that was well below analyst expectations, but it disclosed that Acthar's sales growth would be much lower than expected going forward. During a conference call on that same day, Defendant Trudeau highlighted the fact that the Company was facing a great deal of pressure from health insurance companies and other payers over the cost of Acthar and warned that a string of consolidation in the health insurance industry could make the situation even more difficult.   Defendant Trudeau stated:

> Yeah.  So, first of all, let me say that we're quite pleased with our performance for Acthar in the quarter, $269 million for the quarter, that's an all-time record quarter for the product.   And we're pleased that we're continuing to be able to drive growth, particularly given the fact that last year's third quarter was a particularly strong quarter when it was in the previous owner's

hands.

> We're very encouraged by the promotional effort behind Acthar, but one of the things we are experiencing certainly is a more difficult payer environment certainly then was the case a year ago. And that's really what's changing our perspective with regards to the long-term prospects of Acthar. As I mentioned earlier, we anticipate long term that Acthar will be growing in the mid-single to low-double-digit range over the next couple of years.

> We're very encouraged by the fact, though, that we're making now very good progress with payers. We're having, I think, very productive dialogue with payers and the rest of that is what we announced this morning, is that we've been put on at least one major payer's preferred drug list for Acthar which is a significant event for us. And we continue to have dialogue with a variety of additional payers, primarily around the database behind Acthar and the appropriate positioning of the product as it's used in its variety of indications in autoimmune and rare diseases.

187.    In response to further questioning as to whether "pressure from payers" was offset by success in securing a spot on an insurer's preferred formulary, Defendant Trudeau stated in part:

> what we see is the payer environment […] is certainly eroded a bit from where we were a year ago.  It's more difficult, we think, across the board, across the industry to get reimbursement on key products, and Acthar is no different.  In the case of Acthar, of course, historically, there had been relatively little discussion at the payer policy level regarding the data set around Acthar and the proper positioning of the product. And I think in previous discussions, we had talked about the fact that we had initiated those discussions. And in fact, what we're seeing now, we believe, is the first fruits of those labors where we are getting put in a preferred drug list.

*    *    *

> If I net all of these things out, I think that right now, the pressure from the payer environment is perhaps a little bit stronger than the progress that we've been able to make to this point. But clearly, we're starting to push in the opposite direction. And we would think over time those things would balance themselves out. And I think that's why we're giving the direction of, well, how to think about Acthar in that the revenue growth rates are likely to be

> towards the lower end of our range for the next several quarters until we can make further progress on the payer environment which we believe will still take us a number of quarters to achieve.

188.    In reaction to the August 4, 2015 disclosures, the stock price of Mallinckrodt declined 14% or $17.48 per share, from a close of $124.21 on August 3, 2015 to a close of $106.73 on August 4, 2015.  However, the Company's statements made in the August 4, 2015 continued to be materially false and misleading.   Among other things, Defendant Trudeau's statement that "we're making now very good progress with payers" was false or, at the least, materially misleading, because as the CMS data would later show, the portion of Acthar sales that were being reimbursed through Medicare and Medicaid had consistently increased from 2013 (45%) to 2014 (60%) and to 2015 (61%).  His statement was similarly false and materially misleading because it omitted to state that the Company's projected growth in Acthar sales, in the mid-single to low-double-digit range over the next couple of years, was only possible because of the Company's violations of the antitrust laws and the actions it was taking to maintain the ACTH monopoly for Acthar in the U.S. market.

189.    Further corrective disclosures came primarily from sources outside the Company, but similarly led to significant market corrections of the Company's stock price.

190.    On November 9, 2015, *Citron* Research released a statement likening Mallinckrodt to Valeant Pharmaceuticals and summarized Mallinckrodt's history of price increases for Acthar. The tweet specifically referenced the Company's reimbursement levels:

> "At these prices $MNK [Mallinckrodt] has signif more downside than $VRX [Valeant] – far worse offender of the reimb[ursement] sys[tem] - more to follow. VRX can't live in a vacuum."

By issuing this statement, *Citron* helped to disclose the magnitude of the wrongdoing by Mallinckrodt, and that it was even greater than the notorious benchmark provided by Valeant, which the market knew had already resulted in substantial harm to investors. Following the

issuance of the Citron tweet, the price of the Company's stock fell 17% from a close of $69.89 on November 6, 2015, to close at $58.01 on November 9, 2015.  The November 9, 2015 stock drop wiped out $1.25 billion in Mallinckrodt's market capitalization.[22]

191.   The next day, Defendant Trudeau appeared on CNBC to respond to Citron's allegations in an attempt to forestall a further decline Mallinckrodt's stock price. On CNBC's "Squawk Box," Defendant Trudeau stated that "***the facts [Andrew Left] quoted were mostly, if not completely wrong***." He further said: "We also announced on our third quarter earnings call and confirmed on our guidance call that ***we are having very good success now in getting Acthar into favorable formulary positions*** … ***which should ensure the long-term stability of reimbursement for Acthar***, which is what we are all about.  We are playing the long game with this product because it is very durable, it's very effective for a variety of different autoimmune conditions, and it is one that we think is going to continue to drive value for the company."[23]

192.   The statements referenced above are materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Mallinckrodt's business and operations which were known to or recklessly disregarded by Defendants.

---

[22]   The significance of Citron's November 2015 negative disclosures concerning Mallinckrodt was highlighted in a February 29, 2016 letter from the SEC to Harbaugh, stating:

> We note recent media reports regarding the pricing of Acthar and the potential for increased scrutiny and government investigations regarding such pricing. We also note the substantial decrease in your stock price in November 2015 in response to the negative publicity. Please tell us what consideration you gave to disclosing the material risks to your company related to the public scrutiny of your Acthar pricing, including material impact of any current or potential investigations or litigation.

Mallinckrodt responded on March 11, 2016 with a publicly-filed letter to the SEC that was accessible to investors on the SEC's website.  Mallinckrodt's response disputed the assertions in the November 9, 2015 tweet by Andrew Left of Citron and asserted that the Company's discussion of certain risk factors in the 2014 Form 10-K filed on November 15, 2014, "sufficiently addressed the material risks associated with Acthar."  This was a further false and misleading statement.

[23]   https://www.cnbc.com/2015/11/09/another-drug-stock-tanks-on-citron-short-threat.html.

193.    Defendants failed to disclose that Mallinckrodt's sales of Acthar were dependent on illegal, anticompetitive conduct in preventing a competing synthetic version of ACTH from entering the U.S. market.  Moreover, although Defendant Trudeau chose to comment publicly on Andrew Left's comments about the reimbursement system for Acthar, Defendant Trudeau failed to disclose that, at the time, the Company was obtaining more than 60% of all payments for Acthar from Medicare and Medicaid, which Trudeau had stated on October 6, 2015 – just one month earlier – stood at 25% or "maybe a little higher."

194.    On March 15, 2016, Citron issued another statement on Twitter regarding the Company, noting that the market was beginning to realize that owning Mallinckrodt stock was as risky as owning Valeant. Specifically, Left tweeted "Mkt. is starting to realize that $MNK [Mallinckrodt] equal risk to $VRX [Valeant]. Andrew Left of @Citron on CNBC 5:30 to explain risks of the $MNK platform." Left then appeared on CNBC's Fast Money asserting that Mallinckrodt made Valeant look like a "choirboy," and stated that Mallinckrodt is worse than Valeant because it's "dependence on one drug, close to let's say 50 percent their EBITDA, depends on what metric you want to look at, is dependent on one particular drug. Not let's say 30 like Valeant has.  Left also described Acthar as having "no real clinical testing" and as the "poster child" of price gouging.

195.    Defendant Trudeau dialed-in to Fast Money that day and attempted to rebut Left's statements, declaring: "First and foremost, Mallinckrodt is a well-diversified, strong company. We are transparent. Our strength is both operational and financial."  He further represented that "Acthar represents less than a third of [Mallinckrodt's] business, […]" He reiterated that the Company has a "very strong, solid business model. Well diversified with excellent brands."

196.     Notwithstanding Defendant Trudeau's statements in favor of the Company, shares of Mallinckrodt stock fell after the disclosures made by Left.  Mallinckrodt shares dropped 20% over a two-day period, from a close of $69.61 on March 14, 2016, to a close of $55.69 per share on March 16, 2016.  This two-day drop wiped out another almost $1.5 billion in Mallinckrodt's market capitalization.

197.     Moreover, Trudeau's comments still did not disclose the truth about the Company or its Acthar franchise. Among other things, while Acthar's reported revenues may have been about one-third of the Company's total reported revenues, the Acthar franchise was responsible for far more than one-third of the Company's operating income. An October 12, 2015 analyst report issued by J.P. Morgan had noted the importance of the Acthar franchise to Mallinckrodt, stating its conclusions that Acthar represented $1 billion in sales and about 50% of the Company's operating profit. But, of course, that was only an opinion issued by an outside analyst. And less than a year after Trudeau's comments in mid-March, on November 29, 2016, when Trudeau was responding to the CMS data and *Citron* Report issued on November 14 and 16, 2016, respectively, he admitted that substantially more than one-third of the Company's operating income derived from Acthar sales. As Trudeau stated: "So while our long-term objective is to have no single product account for more than a third of our operating income, currently our concentration has increased a bit and ***certainly Acthar now represents a significant greater proportion of our operating income than a third***."

## THE TRUTH ABOUT MALLINCKRODT IS REVEALED

198.     On November 14, 2016, as alleged above, the CMS released updated drug pricing data for 2015 indicating that Medicare spending on Acthar had increased from $391 million in 2014 to $648.5 million in 2015.  Two days later on November 16, 2016, as further alleged above, the full extent of the Company's reliance on Medicare and Medicaid reimbursements for Acthar

came to light when *Citron* published a report accusing the Company and Defendant Trudeau of securities fraud in connection with Trudeau's representations regarding the percentage of Acthar sales for which Mallinckrodt received Medicare reimbursement were false on the Company's October 6, 2015 conference call, and showing that contrary to the representations that Acthar sales attributed to Medicare and Medicaid "maybe a little higher" than 25% of the Company's sales, they were actually over 60% and 61% in 2014 and 2015, respectively. The *Citron* Report also highlighted the fact that Acthar represents a much more significant portion of the Company's business. Specifically, the *Citron* Report noted "Let's not forget that Acthar continues to represent a massively disproportionate chunk of Mallinckrodt's bottom line a number that Trudeau is happy to dance around, rather than disclose the true concentration of risk it took on when it levered up massively to acquire this never-proven drug."

199.    Following the release of the *Citron* Report, the price of the Company's stock fell 18.4%, from a closing price of $67.80 on November 15, 2016, to a closing price of $55.32 on November 17, 2016. This drop wiped out another $1.31 billion in Mallinckrodt's market capitalization.

200.    Then, on November 29. 2016, before the market opened, Mallinckrodt released results for its fourth quarter 2016 and hosted a quarterly call with analysts. Chris Schott, an analyst from JP Morgan, questioned the Company's product concentration, to which Defendant Trudeau responded: "So while our long-term objective is to have no single product account for more than a third of our operating income, currently our concentration has increased a bit and certainly Acthar now represents a significantly greater proportion of our operating income than a third." Defendant Trudeau did not provide what proportion of Mallinckrodt's operating income Acthar actually represented, but this admission made clear that Defendant Trudeau's prior

statement, on March 15, 2016, that Acthar represented less than one-third of the Company's business was false or, at the least, materially misleading.

201.   The news of the Company's actual reliance on Acthar for substantially more than one-third of its total operating income, along with other disclosures made that day, caused Mallinckrodt's stock price to drop 9.1% from a close of $57.67 per share on November 28, 2016 to a close of $52.42 per share on November 29, 2016. This drop wiped out an additional $550 million in Mallinckrodt's market capitalization.

202.   Further, on January 18, 2017, as alleged above, the FTC and the States of Alaska, Maryland, New York, Texas and Washington filed a complaint against Mallinckrodt alleging that the Company violated antitrust laws when Questcor acquired the rights to Synacthen, a drug that threatened its monopoly in the U.S. market for ACTH drugs, and thereafter continued to charge monopoly prices for Acthar and suppress any development of Synacthen in the U.S. market for indications that would have competed with Acthar. FTC Chairwoman Edith Ramirez stated "Questcor took advantage of its monopoly to repeatedly raise the price of Acthar, from $40 per vial in 2001 to more than $34,000 per vial today – an 85,000 percent increase. We charge that, to maintain its monopoly pricing, it acquired the rights to its greatest competitive threat, a synthetic version of Acthar, to forestall future competition. This is precisely the kind of conduct the antitrust laws prohibit."

203.   Along with the filing of the FTC Complaint, the FTC also filed a Consent Decree in which Mallinckrodt agreed to pay $100 million to settle the claims alleged against the Company, which equated to 43% of Mallinckrodt's total operating income (before taxes) for its 2016 fiscal year. In addition, as part of the settlement with the FTC, Mallinckrodt was required

to agree to license Synacthen to a competitor who could then commercialize the drug in the U.S for the treatment of Infantile Spasms and Nephrotic Syndrome.

204.   On this news of the Complaint and Consent Decree, the price of the Company's stock fell 5.85%, from a close of $49.42 on January 17 to a close of $46.53 of January 18, 2017. This stock drop wiped out over $300 million in Company market capitalization.

205.   Finally, on November 7, 2017, as alleged above, the truth about Mallinckrodt's Acthar product was revealed and the falsity of Defendants' statements made during 2017 concerning Acthar's claimed growth across the payer mix, strengthened formulary positions, removal or relaxation of previous formulary restrictions, expansion in terms of the number of commercial lives under contract, and guidance throughout this time period for mid-single digit to low-double digit growth in net Acthar sales, came to light when the Company reported for the first time in its history that net sales of Acthar in the quarter had declined from the net sales in the comparable quarter in the prior year. With the disclosures of November 7, 2017, the price of Mallinckrodt stock fell by 35.5%, falling by $11.07 per share from a closing price of $31.18 on November 6, 2017, to a closing price of $20.11 on November 7, 2017, on enormous volume of over 34 million shares traded.  This stock drop wiped out $1.05 billion in the Company's market capitalization.

**THE COMPANY'S STATEMENTS DURING 2017 CONCERNING ACTHAR'S CLAIMED GROWTH ACROSS PAYER MIX, STRENGTHENED FORMULARY POSITIONS, REMOVAL OR RELAXATION OF FORMULARY RESTRICTIONS, EXPANSION IN COMMERCIAL LIVES UNDER CONTRACT AND GUIDANCE WERE MATERIALLY FALSE OR MATERIALLY MISLEADING**

206.   Even after the revelations concerning the extent of Acthar sales that were reimbursed by Medicare and Medicaid compared to private insurers and the settlement with the FTC, the Company continued to make statements that misled the market with respect to the long-term prospects for its Acthar sales and served to maintain Mallinckrodt's stock price at

artificially inflated levels.  These included statements concerning Acthar's claimed growth across the payer mix, strengthened formulary positions, removal or relaxation of previous formulary restrictions, expansion in terms of the number of commercial lives under contract, and guidance throughout this time period for mid-single digit to low double-digit growth in net Acthar sales.

207.    On January 19, 2017, the day after the FTC settlement was announced, Defendant Trudeau, Investor Relations head Coleman Lannum and CSO Steven Romano participated in a "Business Update Call" with analysts.  Defendant Trudeau described the settlement with the FTC as merely "another step forward in our overall overhang de-risking process" stemming from Mallinckrodt's acquisition of Questcor, as was the earlier settlement of the antitrust claims asserted by Retrophin and said that the FTC settlement did nothing to change the competitive environment for Acthar.  Indeed, after noting that the FTC settlement provided for a licensing of Synacthen for infantile spasms and nephrotic syndrome, Romano said that Mallinckrodt had never considered the development of Synacthen for those purposes, and Lannum said the Company ascribed "zero value" to those assets. (This was, of course, inconsistent with the valuation that Questcor, which Mallinckrodt acquired for $5.6 billion in cash and stock and now was a subsidiary of Mallinckrodt, placed on Synacthen when it outbid at least three other potential acquirers to obtain the U.S. development rights to Synacthen, thereby eliminating the risk that someone would develop Synacthen as a competing drug to Acthar.)  Defendant Trudeau added in this regard that Mallinckrodt continued to see Acthar "as an exceptionally durable asset" and reiterated the Company's belief that "we will be able to consistently drive mid single digit to low double-digit growth based predominantly on volume."[24]

---

[24]        Accessible at: http://www.media-server.com/m/acs/13bb9558a227350d4f59c9fb6f60da8e.

208.    On February 7, 2017, the Company reiterated this guidance in a press release filed as an exhibit to a Form 8-K and during an Earnings Call that (a) reported on the Company's results for the transition period from October 1, 2016 to December 30, 2016, and (b) provided guidance for the year 2017.  The press release reported that Acthar net sales were $325.4 million, a 13.5% increase over net Acthar sales of $286.7 million in the comparable quarter in 2015.  The Company further gave guidance for the upcoming 52-week calendar year, which it contrasted with the prior 53-week fiscal year.  The Company projected adjusted diluted earnings per share of $7.40 to $8.00 per share, and an increase of 4% to 7% for the net sales of the Specialty Brands segment (the segment that markets Acthar).

209.    During the earnings call the same day, Defendant Trudeau addressed the FTC settlement, stating: "Although we strongly disagree with the allegations outlined in the FTC's complaint, this resolution removes the long-term distraction and overhang of litigation and allows us to more fully concentrate on growing and expanding our business."  He stated that since acquiring Acthar, the Company had "consistently focused on two things to create long-term sustainable value.  First, expand access and reach to appropriate patients, and second work deliberately and systematically to resolve overhanging legacy issued we inherited when we acquired the drug."  He represented that the Company had made "great progress in both areas."

210.    Defendant Trudeau further stated during the call that with these efforts, "we've also seen growth in Acthar in the mid-single-digit to low double-digit range driven predominantly from volume increases in both commercial and public payer plan. […]  We expect these trends to continue."  And, in response to an analyst question about the Acthar payer mix, Defendant Trudeau stated:

> Again, this is another, I think, real strength of the brand is that not
> only are we seeing good growth across the range of therapeutic

area indication.  We're also seeing very good growth across the payer mix.  Just to give you a little bit of perspective when we inherited Acthar, we also inherited some challenges in the commercial sector. If you recall, we had a number of payers who had made some restrictions to their formularies regarding Acthar before we took possession of the drug.

And so, between '14 and '15, we had some real work to do on the commercial side of the business and through our contracting and engagement strategy with commercial payers. We actually stabilize that situation and return the situation to growth between '15 and '16. So, now we've got very good growth in both commercial as well as public payers. And again, our mix of our payer mix of business has been relatively consistent now for quite some time certainly throughout 2016.

211.    On May 8, 2017, the Company reported its results for the first quarter 2017.  The Company reported that Acthar net sales were $271.8 million, a 9.4% increase over $248.4 million in the comparable quarter in 2016.  Commenting on the Acthar sales, Defendant Trudeau was quoted in the press release as stating: "Notably, we continue to see strengthening in Acthar formulary positions and access for appropriate patients in both the commercial and public environments, including relaxation or removal of previous formulary restrictions and, in at least one case, addition of Acthar to a formulary for the first time."  Commenting further during the earnings call the same day, Trudeau stated that "we continue to strengthen formulary position and access to Acthar," including actions "relaxing or removing previous formulary restrictions."[25]    He continued: "We're pleased with the ongoing progress and further stabilization we're achieving within the payer landscape and believe the high unmet medical need and low market penetration in most indications will support increased demand growth for Acthar."

---

[25]    Accessible    at:    https://seekingalpha.com/article/4070664-mallinckrodt-plc-mnk-q1-2017-resultsearnings-call-transcript.

212.    Trudeau represented that the Company was still achieving 60% commercial lives under contract for Acthar, which further was said to give Mallinckrodt "good confidence that we can continue to drive the long-term growth rate expectations in the mid-single to low double-digit range."[26]   Harbaugh added that the Company's rebating strategy "was fully considered in the guidance that we provided."   Finally, Lannum reiterated that: "All the ranges that we gave on the last call in February remain unchanged at this time."

213.    On May 19, June 6 and June 22, 2017, Mallinckrodt issued press releases in response to reports issued by short-sellers.   In these releases, among other things, the Company stated that Acthar's efficacy in its approved indications was strongly supported by evidence; that the Company had expanded the number of commercial lives under contract from zero to nearly 60%; and that in the commercial reimbursement space, "the majority of payers have an established pathway for the use of H.P. Acthar Gel in those patients for whom it is appropriately prescribed – those with conditions covered by the FDA-approval label and for whom the product's extensive existing data and clinical experience support H.P. Acthar Gel's use as a proven therapy."   The Company further represented that the "prior-authorization and

---

[26]    Shortly after Mallinckrodt acquired Questcor, the Company began a project that had a "long-term objective" to bring the majority of "covered lives" under contract in order to solidify Acthar's reimbursement from private insurers. In the Company's earnings call of February 2, 2016, Defendant Trudeau stated that Acthar's commercial coverage "stands at about a third of the total eligible US patient population under contract with key payers and we continue to focus on expanding coverage with other major payers."   He further stated: "we're pleased with the progress we're making in managed care with regards to access" and that "we continue to make progress and continue to have a very good dialogue with managed care." During the earnings call of August 2, 2016, Trudeau again addressed this "long-term objective" and stated that "over the course of the last two years or so, we have moved that [the proportion of covered lives under contract for Acthar] from zero to now greater than 50%."   In making these statements, and others in the year 2017, Trudeau sought to assure analysts and investors that the Company was moving in a positive direction to obtain significant increases in reimbursement payments for Acthar from private insurers.

reimbursement processes used by commercial payers rely on these criteria, and are not bypassed through co-pay programs."

214.    On August 8, 2017, the Company announced its results for the second quarter ended June 30, 2017 in a press release and hosted a call with analysts the same day.  In the press release, the Company reiterated its EPS guidance at $7.40 to $8.00 notwithstanding that net sales were down 4.9% to $824.5 million in the quarter compared to the same quarter in 2016, and that adjusted diluted EPS in the quarter were $1.85 compared to $2.03 in the same quarter in 2016.

215.    The Company further reported that Acthar net sales were $319.4 million in the second quarter period, a 7.1% increase over $298.3 million in the same quarter in 2016.

216.    On the earnings call that day, Defendant Trudeau stated that Acthar's 7.0% growth during the quarter was "within our long-term range of mid-single to low double digits," noting that while increased price was the "driver" during the second quarter, the Company's expectations "longer term are that growth will be predominantly volume-driven, and we expect to see that in the back half of the year."   He further stated: "we've been building on the strengthening formulary positions we've reported in the first quarter and are pleased to see that new patient prescriptions have reached their highest point in the last 12 months across the majority of promoted indications as we reach a broadening base of prescribers with additional data."   Trudeau added in response to an analyst question concerning Acthar: "In terms of the growth, we would expect kind of similar type growth rates regardless of the payer mix, whether it's federal reimbursed patients, Medicare primarily or commercial patients, we would expect similar growth rates regardless of the type of reimbursement that occurs."   He further said: "we continue to see good, strong formulary positioning, strengthening formulary positions that we

alluded to in the first quarter," and that with the new data the Company had published on Acthar, "we wouldn't expect anything different here going forward."[27]

217.    Defendants' 2017 statements cited above, omitted key information and, thus, misled the market into believing that as Acthar prescription levels increased, so too would its net sales.  First, Defendants' claims during 2017 that Acthar's efficacy in its approved indications was strongly supported by evidence was highly misleading.  As the authors of the seminal report published in a leading medical publication, the Journal of the American Medical Association ("JAMA"), wrote in reply to a letter from Mallinckrodt's Chief Medical Officer, while Acthar has been found to be effective for infantile spasms and to treat relapses of multiple sclerosis, "the remainder of studies, as summarized in the review cited by Dr. Otulana, are of low quality, consisting primarily of case series, small uncontrolled single-arm studies, and several observational studies of health care utilization."[28]    As a result, they wrote: "Given the preponderance of small and uncontrolled single-arm studies, we have serious doubts that these studies will provide scientific evidence sufficient to justify use of Acthar at its current price."

218.    Second, Defendants' consistent invocations of increased percentages of commercial lives under contract, that "the majority of payers have an established pathway" for

---

[27]    Saying that Mallinckrodt had strengthened Acthar's formulary position conveyed to the market that Acthar was being included in more insurers' formularies of approved medications under their plans and that insurers had expanded the circumstances (for instance, for treatment indications and for the duration of treatments) under which they would approve and provide reimbursement for Acthar.

[28]    This constituted a serious critique of Mallinckrodt's data.  An arm of a study is a group of patients receiving a particular treatment (or no treatment at all).  A single arm study is one in which all of the patients receive the same treatment; there is no control or other experimental group.  This is distinguished from a two-arm randomized trial, in which patients are randomly assigned to two different groups: one group to receive the drug being tested, and a second group to receive an alternative treatment or a placebo, in order to compare their medical outcomes.  Single arm studies are typically used in phase II of clinical trials, whose main objective is to determine whether a new treatment warrants further testing in a randomized phase III trial.  Similarly, there is no randomized study of different treatments in observational studies or case series.

the use of Acthar in patients for whom it is appropriately prescribed for conditions covered by the FDA-approval label, and the Company's often repeated anticipated "mid-single to low double digits" Acthar growth rates, were highly misleading since many private insurers – throughout 2017 – had approved reimbursement for Acthar for only a few of its indications. For instance, Aetna's Clinical Policy Bulletin ("CPB") for Repository Corticotrophin Injection (Acthar) had stated on August 8, 2008, that Acthar was "considered medically necessary for diagnostic testing of adrenocortical function, West syndrome (infantile spasms), and any of the FDA approved indications for repository corticotrophin after the patient has failed corticosteroidtherapy."[29]  Over the years, however, the CPB was revised to state that Acthar was considered: "not medically necessary for diagnostic testing of adrenocortical function" and "not medically necessary for corticosteroid-responsive conditions because it has not been proven to be more effective than corticosteroids for these indications" (Sept. 14, 2012);[30] "experimental and investigational for dermatopolymyositis, nephrotic syndrome (including focal segmental glomerulo-sclerosis, idiopathic membranous nephropathy, IgA nephropathy, membranoproliferative glomerulo-nephritis, and monoclonal diffuse proliferative glomerulo-nephritis), and systemic lupus erythematosus" (Dec. 9, 2014);[31] "experimental and investigational for amyotrophic lateral sclerosis, multiple sclerosis, optic neuritis, and rheumatoid arthritis" (Nov. 20, 2015);[32] and "experimental and investigational for birdshot

---

29      Accessible at: http://www.aetna.com/cpb/medical/data/700_799/0762.html.

30      Accessible at: http://www.aetna.com/cpb/medical/data/disclaimer/review/700_799/0762_5.html.

31      Accessible at: http://www.aetna.com/cpb/medical/data/disclaimer/review/700_799/0762_9.html.

32      Accessible at: http://www.aetna.com/cpb/medical/data/disclaimer/review/700_799/0762_11.html.

choroiditis, pulmonary sarcoidosis, neurosarcoidosis, and uveitis (including panuveitis and posterior uveitis)" (Nov. 3, 2017).[33]

219.   Similarly, Cigna's coverage policies provide that while Acthar is considered to be "medically necessary" for treatment of infantile spasms in an individual less than 2 years old, it is considered to be "not medically necessary for all other indications."  Cigna's coverage policies further states:

> Current evidence does not support any definitive benefit to the use of H.P Acthar Gel over conventional corticosteroids and/or immunosuppressive therapy (including prednisone and methylprednisolone) for FDA approved indications other than treatment of infantile myoclonic seizures.  H.P. Acthar Gel is clinically equivalent but not superior to conventional corticosterois and/or immunosuppressive therapy for the treatment of multiple sclerosis, rheumatic disorders, collagen diseases, dermatologic disorders, allergic states, ophthalmic diseases, respiratory diseases, or edematous states, and is significantly more expensive. Coverage for H.P. Acthar Gel may therefore depend upon the applicable health benefit plan definition of medical necessity. Where that definition limits coverage to the most cost-effective equivalent treatment, the use of H.P. Acthar Gel for indications other than infantile myoclonic seizures is considered not medically necessary.

220.   Similarly, United Healthcare's policy with respect to Acthar, which was revised on September 1, 2017 and remains in place today, states that while Acthar is "proven and medically necessary" for the treatment of infantile spasm for up to 4 weeks when its enumerated criteria are met and for the treatment of opsoclonus-myoclonus syndrome (*i.e.*, OMS, Kinsbourne Syndrome) when its enumerated criteria are met, and may also be covered for nonmedical necessity plans for the treatment of acute exacerbation of multiple sclerosis, it is "unproven and not medically necessary" for treatment of the following disorders and diseases: rheumatic disorders (psoriatic arthritis, rheumatoid arthritis, including juvenile rheumatoid

---

[33]     Accessible at: http://www.aetna.com/cpb/medical/data/disclaimer/review/700_799/0762_15.html.

arthritis, ankylosing spondylitis); collagen diseases (systemic lupus erythematosus, systemic dermatomyositis (polymyositis)); dermatologic diseases (severe erythema multiforme, Stevens-Johnson syndrome); allergic states (serum sickness); ophthalmic diseases (severe acute and chronic allergic and inflammatory processes involving the eye and its adnexa, such as keratitis, iritis, iridocyclitis, diffuse posterior uveitis and choroiditis, optic neuritis, chorioretinitis, anterior segment inflammation); respiratory diseases (symptomatic sarcoidosis); edematous state (to induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus); and any indication outside of the proven indications above.[34]

221.    Many Blue Cross Blue Shield entities had similarly not expanded their approvals for Acthar treatments beyond a few indications.  For example, Independence Blue Cross Blue Shield, which serves Southeastern Pennsylvania, adopted a policy that had become effective November 25, 2014, and has remained in place, under which it will only approve the use of Acthar to treat infantile spasms in individuals age 2 or younger, and will not approve requests for Acthar for uses such as, but not limited to: multiple sclerosis; rheumatic disorders (*e.g.*, psoriatic arthritis, rheumatoid arthritis, juvenile rheumatoid arthritis, ankylosing spondylitis); collagen diseases (*e.g.*, systemic lupus erythematosus, systemic dermatomyositis [polymyositis]); dermatologic disease (*e.g.*, severe erythema multiforme, Stevens-Johnson syndrome); allergic states (*e.g.*, serum sickness); ophthalmic diseases (*e.g.*, keratitis, iritis, iridocyclitis, diffuse posterior uveitis, choroiditis, optic neuritis, chorioretinitis, anterior segment inflammation);

---

[34]    Accessible at:  https://www.uhcprovider.com/content/dam/provider/docs/public/policies/comm-medicaldrug/repository-corticotropin-injection-hp-acthar-gel.pdf.  This is the same policy for Acthar that United Healthcare issued on February 1, 2017 (accessible at:  http://docplayer.net/40845558-Repositorycorticotropin-injection-h-p-acthar-gel.html), which undercuts Defendants' claims that restrictions were being relaxed during 2017.

respiratory conditions (*e.g.*, symptomatic sarcoidosis); to induce a diuresis or a remission of proteinuria in nephrotic syndrome without uremia of the idiopathic type or due to lupus erythematosus; corticosteroid-responsive conditions; or diagnostic testing for adrenocortical function.[35]

222.    Thus, notwithstanding the Company's representations about Acthar having gained greater access to insurance coverage for private managed care, the reality was that many major insurers were continuing to approve Acthar only for a limited range of treatments, and others were continuing to place severe restrictions on the duration of Acthar treatments, both of which created an undisclosed risk that a substantial portion of the prescriptions written for Acthar would never be filled and Acthar sales could decline.    The Company's statements about improved access to private insured lives were, for these reasons, false and/or materially misleading.

223.    The falsity of the Company's statements in this regard came to light when, on November 7, 2017, the Company reported for the first time in its history that net sales of Acthar in the quarter had declined from the net sales in the comparable quarter in the prior year. Specifically, the Company disclosed that its net sales of Acthar in the third quarter ended September 29, 2017 were $308.7 million, down by 5.6% from net sales of $327.0 million during the same quarter in 2016. Mallinckrodt 3Q2017 Form 10-Q, at 35.  The $308.7 million in third quarter 2017 Acthar net sales also missed analysts' consensus estimate of $326.6 million. *Reuters*, "Mallinckrodt slumps as Acthar drug sales disappoint," Nov. 7, 2017, 8:38 a.m.

---

[35]      Accessible at:
http://provcomm.ibx.com/ProvComm/ProvComm.nsf/afe9b349fb4d82ef85257912006dc3f7/418febd7be2350ab85257d6400654e43.

224.     During the third quarter 2017 earnings call held on November 7, 2017, Defendant Trudeau said that "Acthar sales growth slowed in the quarter impacted by both the comparison against 2016 with an additional selling week and a volume decline."  He attributed the volume decline to the fact that "as the third quarter progressed, we saw an increasing number of prescriptions going unfilled beyond the level we had seen previously," which the Company anticipated would take time to work through, leading to the expectation that fourth quarter 2017 Acthar net sales would also be down sequentially and that the Company would thereafter provide guidance for the year 2018.  In responding to one of the many analyst questions concerning the Company's Acthar sales, Trudeau admitted that Acthar "continues to experience payer pressures" and "we expect those payer pressures to continue to be more challenging.  We expect payers to put more and more hurdles in front of patients getting reimbursement.  […]  The situation that we're experiencing now is this combination of both those payer pressures, plus … the additional issue that we're seeing with these patient prescriptions going unfilled at this point."

225.     The decline in Acthar sales in the third quarter 2017 from the comparable quarter in 2016 was no fluke.  In fact, confirming the private payer issues facing the Company and that were materially misrepresented during the Relevant Period, declining sales have continued into the fourth quarter 2017 and the first quarter 2018.  Net Acthar sales of $295.2 million in the fourth quarter 2017 (ended December 29, 2017) represented a 9.3% decline from net sales of $325.4 million in the fourth quarter 2016.  And net Acthar sales of $243.8 in the first quarter 2018 (ended March 30, 2018) represented a 10.3% drop from net sales of $271.8 million in the first quarter 2017.

## IN THE ALTERNATIVE TO BRINGING THEIR CLAIMS DERIVATIVELY, PLAINTIFFS' CLASS ACTION ALLEGATIONS

226.    In the alternative, Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Mallinckrodt securities under the ESPP between July 14, 2014 and November 6, 2017, inclusive, and who incurred statutory damages.

227.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  While they presumably did not all participate, the Company's January 22, 2016, Proxy Statement states that "[a]s of January 8, 2016, approximately 4,000 employees were eligible to participate in the ESPP." Record owners and other members of the Class may be identified from records maintained by Mallinckrodt or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

228.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

229.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

230.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)      whether the statements made by Defendants to the investing public in the Registration Statement and Prospectus were materially false and misleading or omitted material information necessary to make such statements not materially misleading;

(c)      whether statements made by Defendants to the investing public in the Registration Statement and Prospectus created a misleading impression of Mallinckrodt's value; and

(d)      to what extent Plaintiff and the other members of the Class have sustained damages.

231.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Against Defendants for Violation of Section 11 of the Securities Act)

232.    Plaintiff repeats and re-alleges each and every allegation contained above, except any allegation of fraud, recklessness or intentional misconduct.

233.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

234.    Plaintiffs' claims were brought within one year from the discovery of the false statement or omission, or from the time such discovery should have been made through the use of reasonable diligence.

235.    The Registration Statement for the ESPP was materially misleading and/or omitted to state material facts required to be stated therein.

236.    Mallinckrodt is the registrant for the offering. Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

237.    As issuer of the shares, Mallinckrodt is strictly liable to Plaintiff and the other members of the Class for the material misstatements and omissions in the Registration Statement.  The other Defendants are liable unless they can sustain an affirmative defense that they had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading

238.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

239.    This action was brought within one year after the discovery of the untrue statements or omissions.

240.    Accordingly, Defendants are liable to the ESPP (Plaintiffs and Company employees who purchased Company stock in the ESPP) for damages.

## COUNT II

### (Against the Committee Defendants for Breach of Fiduciary Duty)

241.    Plaintiffs reallege each and every allegation set forth above as if each was set forth in full herein.

242.    The ESPP was a Trust, and every trust must have a trustee that serves as a fiduciary.

243.    A fiduciary who breaches any of his or her responsibilities, obligations or duties shall be personally liable to make good to his wards any losses resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

244.    The Committee Defendants or their designees,[36] had a duty to discharge their duties with respect to the Plaintiffs and/or the ESPP solely in the interests of the participants in the ESPP and for the exclusive purpose of providing a benefit of the employment bargain to the participants.  Defendants' administration and management of the ESPP were subject to the above-described fiduciary duties. Defendants allowed the ESPP to waste assets by purchasing artificially inflated Mallinckrodt stock.

245.    Defendants had the power to control the ESPP.  Defendants oversee the ESPP and are empowered to appoint administrators or to administer the ESPP.

246.    By virtue of their position, Defendants were in a superior position vis-à-vis Plaintiffs and members of the ESPP to determine the prudence in continued investment in Mallinckrodt stock.  Further, Defendants possessed special knowledge and expertise about the Company such that Plaintiffs and members of ESPP reposed confidence in their offer of Mallinckrodt stock as part of the Company's overall compensation package.

247.    The wages that Plaintiffs and members of the ESPP diverted into the ESPP were the property of Plaintiffs and members of the ESPP.  By accepting and maintaining the property of Plaintiffs and members of the ESPP, Defendants assumed a fiduciary duty to preserve that

_____

[36] To the extent there were any such designees, Defendants who served on the Committee had a duty to inform and monitor such designees.

property and to keep Plaintiffs and members of the ESPP reasonably informed about all facts relevant to their participation in the ESPP.

248.    In breach of the fiduciary duty owed to Mallinckrodt employees, Defendants failed to inform Plaintiffs and members of the ESPP of all of the relevant facts surrounding their investment in Mallinckrodt stock through the ESPP.   Further, Defendants breached their fiduciary duty by allowing investment in Mallinckrodt stock through the ESPP to continue, even though they knew or should have known that the investment was imprudent and likely to result in significant losses for Plaintiffs and members of the ESPP.

249.    Defendants' breaches exceeded the scope of their authority as corporate officers and directors.

250.    As a consequence of Defendants' breaches, Plaintiffs and the other members of the ESPP suffered losses.

251.    Defendants are individually liable to make good to Plaintiffs and the other members of the ESPP any losses suffered resulting from each breach.

252.    As a consequence of Defendants' breaches, the ESPP suffered losses.

253.    Defendants are individually liable to make good to the ESPP any losses suffered resulting from each breach.

## COUNT III

### (Against Defendants for Misrepresentation and Nondisclosure)

254.    Plaintiffs reallege each and every allegation set forth above as if each was set forth in full herein.

255.    A fiduciary who breaches any of his or her responsibilities, obligations or duties shall be personally liable to make good to his or her wards any losses to his or her ward, resulting

from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

256.    Defendants had a duty to discharge their duties with respect to the ESPP solely in the interests of the participants.

257.    Defendants breached their fiduciary duties in that they made material misrepresentations and nondisclosures to their wards as alleged above.

258.    Defendants are individually liable to make good to Plaintiffs and the participants in the ESPP, and to the ESPP themselves, any losses suffered as a result of their breaches.

## COUNT IV

### (Against the Committee Defendants for Mismanagement of the ESPP's Assets)

259.    Plaintiffs reallege each and every allegation set forth above as if each was set forth in full herein.

260.    A fiduciary who breaches any of his responsibilities, obligations or duties shall be personally liable to make good to the ESPP any losses suffered by Plaintiffs and the participants in the ESPP resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

261.    The Committee Defendants were required to discharge their duties with respect to the ESPP and the participants in the ESPP solely in the interests of the ESPP and the participants therein, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims.

262.    As a consequence of these breaches, Plaintiffs and the participants in the ESPP, and the ESPP themselves, suffered losses.

263.    The Committee Defendants are individually liable to make good to the ESPP, Plaintiffs and the participants in the ESPP any losses suffered as a result of their breaches.

## COUNT V

### (Against Defendants for Breach of Contract)

264.    Plaintiffs reallege each and every allegation set forth above as if each was set forth in full herein.

265.    Plaintiffs and the other participants in the ESPP entered into an agreement with Defendants that was part of the employment bargain, which among other things, required Defendants to properly manage and monitor the ESPP.

266.    Plaintiffs and the other participants in the ESPP performed their obligations under the agreement by devoting their labor to the benefit of Defendant Mallinckrodt and by investing part of their salaries owed by Mallinckrodt into Mallinckrodt stock inside the ESPP.

267.    Defendants are individually liable to make good to the ESPP, Plaintiffs and the participants any losses suffered as a result of their breaches.

## PRAYER

**WHEREFORE**, Plaintiffs pray for relief and judgment as follows:

(A)    A judgment awarding compensatory damages in favor of the ESPP, or alternatively Plaintiff and the other participants of the ESPP, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, plus pre-judgment and post-judgment interest thereon at the highest rates permissible at law or in equity;

(B)    A judgment awarding the ESPP, or alternatively Plaintiffs and the other members of the ESPP, their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(C)     In the alternative, if Plaintiffs claims do not proceed derivatively, an order under Rule 23 of the Federal Rules of Civil Procedure determining that this action is a proper class action, designating Plaintiffs as class representatives and designating Plaintiffs' counsel as Class Counsel; and

(D)     A judgment awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 4, 2018                        Respectfully submitted,

By:   */s/ Steven J. Toll*
      **COHEN MILSTEIN SELLERS & TOLL PLLC**
      Steven J. Toll (D.C. Bar No.: 225623)
      Daniel S. Sommers (D.C. Bar No.: 416549)
      Elizabeth A. Aniskevich (D.C. Bar No.: 994603)
      1100 New York Avenue, N.W.
      Washington, DC 20005
      Telephone: (202) 408-4600
      Facsimile: (202) 408-4699
      Email: stoll@cohenmilstein.com
      Email: dsommers@cohenmilstein.com
      Email: eaniskevich@cohenmilstein.com

      John B. Isbister (D.C. Bar No. 277418)
      Jaime W. Luse (D.C. Bar No. 501944)
      **TYDINGS & ROSENBERG LLP**
      One East Pratt Street Suite 901
      Baltimore, MD 21202
      Telephone (410) 752-9700
      Facsimile: (410) 727-5460
      Email: jisbister@tydingslaw.com
      Email: jluse@tydingslaw.com

      ***Co-Liaison Counsel***

Michael Klein
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY 10017
Tel: (212) 687-7230
Fax: (212) 490-2022
Email: mklein@ssbny.com

Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gmelaw.com

*Co-Lead Counsel*